UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

```
 _____
                         |
UNITED STATES OF AMERICA, |
            Plaintiff,    |   Case No.:
                          |   3:16-CR-00148 (VLB)
      vs.                 |
                          |
EDWARD J. KOSINSKI,       |
            Defendant.    |   November 27, 2017
 _____ |
```

                                Federal Building
                                450 Main Street
                                Hartford, Connecticut


TRIAL – DAY 5


(Transcription from Electronic Recording)



Held Before:

            THE HON. VANESSA L. BRYANT
            United States District Judge

Transcription Services of
FALZARANO COURT REPORTERS, LLC
4 Somerset Lane
Simsbury, CT 06070
860.651.0258
www.falzaranocourtreporters.com

APPEARANCES:


For the Plaintiff:

     OFFICE OF THE UNITED STATES ATTORNEY
     157 Church Street, 25th Floor
     New Haven, Connecticut 06510
     203.821.3700
     heather.cherry@usdoj.gov
     jonathan.francis@usdoj.gov
        BY:  HEATHER L. CHERRY, Esq.
            Assistant United States Attorney
               -and-
            JONATHAN N. FRANCIS, Esq.
            Assistant United States Attorney


For the Defendant:

     SPEARS MANNING LLC
     2425 Post Road, Suite 203
     Southport, Connecticut 06890
     203.292.9766
     bspears@spearsmanning.com
     smanning@spearsmanning.com
     nbuchok@spearsmanning.com
        BY:  BRIAN E. SPEARS, Esq.
               -and-
            STEPHEN V. MANNING, Esq.
               -and-
            NATHAN J. BUCHOK, Esq.

```
 1              (Proceedings commenced:  9:38 a.m.)

 2

 3              THE COURT:  Good morning.  Please be

 4      seated.

 5              ALL:  Good morning, your Honor.

 6              THE COURT:  As you know, I excused

 7      ██████████████ last week owing to her

 8      financial hardship, and she will, therefore,

 9      be replaced as a juror with Alternate

10      Number 1, who is ███████████████.

11              Are we ready to proceed?

12              MS. CHERRY:  Yes, your Honor.

13              MR. SPEARS:  Yes, your Honor.

14              THE COURT:  I hope everyone had a nice

15      holiday.

16              MR. SPEARS:  Thank you, your Honor.

17      Yes, we did.

18              THE COURT:  All right.  Take a deep

19      breath.  We're ready.

20              COURTROOM DEPUTY:  Bring in the jury,

21      your Honor?

22              THE COURT:  Yes, please.

23

24              (Jury panel entered the courtroom.)

25
```

1           THE COURT:  Would counsel please

2     stipulate to the presence of the entire jury?

3           MS. CHERRY:  Yes, your Honor.

4           MR. SPEARS:  Yes, your Honor.

5           THE COURT:  Thank you.

6           Please be seated.

7           Good morning, ladies and gentlemen.  I

8     trust you had a lovely holiday.

9           All right.  Counsel will now provide you

10     with their closing statements, and we're

11     going to begin with the Government.

12           Does the Government intend to reserve

13     time?

14           MS. CHERRY:  Yes, your Honor.  I'd like

15     to reserve about 15 minutes.

16           THE COURT:  Very good.

17           MS. CHERRY:  Can you all see that?

18           May it please the Court?

19           THE COURT:  Yes.

20

21      CLOSING ARGUMENT BY THE GOVERNMENT

22

23           MS. CHERRY:  Good morning, ladies and

24     gentlemen.

25           The defendant, Edward Kosinski, abused

his position as a trusted principal
investigator in the REGULATE-PCI clinical
trial by misusing Regado's secret valuable
information to benefit himself financially.

On the first day that we met, I showed
you this chart. I walked you through the
timeline of events, and I told you exactly
what the evidence would show -- that
Dr. Kosinski engaged in a deliberate scheme
of insider trading when he used Regado's
inside information to get an illegal
advantage over ordinary investors.

And that is exactly what the evidence
showed -- that, when Dr. Kosinski received an
email on Sunday, June 29th, that the Regado
REGULATE-PCI clinical trial was put on hold
because of allergic reactions, he knew he was
about to lose money; that Dr. Kosinski then
executed a plan so that he would not lose
money as soon as he could. As soon as the
stock market opened Monday morning, he dumped
his Regado stock, all of it, selling it
before Regado told the public that the trial
was put on hold, taking advantage of the
information that he had that he knew others,

1    ordinary investors, did not have.  And when

2    Regado shared that information with the

3    public two days later, Regado's stock price

4    fell, and Dr. Kosinski avoided losing money.

5         The evidence also showed that

6    Dr. Kosinski's willingness to use Regado's

7    secret nonpublic important information for

8    financial gain didn't stop with that first

9    trade.

10        You saw the evidence.  You saw that,

11   when Dr. Kosinski learned that someone had

12   died in the clinical trial, he didn't think

13   about his patients.  He thought about his

14   wallet.  He placed a sophisticated bet on

15   Regado stock because, in his own words, he

16   was greedy.  And he won this bet.

17        Everything that you need to know can be

18   found on this chart.

19        So, ladies and gentlemen, it's been ten

20   days since we last met, and this morning I

21   can't go through every piece of evidence that

22   you heard during the course of the trial, but

23   I will focus on and highlight the evidence

24   and the testimony that I think will help you

25   answer this one question that essentially

sums up what this case is about:  Did the
defendant intentionally violate a duty of
trust and confidence to Regado?  The answer
is yes, and the evidence supports this
conclusion beyond a reasonable doubt.  So
let's walk through this evidence.

Let's start with the duty and
confidence.

The evidence showed that beyond a
reasonable doubt Dr. Kosinski owed a duty of
trust and confidence to Regado.  Remember
Dr. Kosinski entered into something called a
clinical study and research agreement, or a
CSRA.  It was Government's Exhibit 4.  And
this document was introduced by Ms. Terri
Zito of C5Research.  She was the first
witness to testify, and she described how the
agreement stated Dr. Kosinski's obligations
to Regado as a principal investigator in the
REGULATE-PCI trial.

You'll have this agreement with you when
you deliberate, and you can look at the
entire thing for yourselves, but I want to
focus on one section of the agreement, the
section that defined Dr. Kosinski's promises

1       with respect to Regado's confidential

2       information, and that's Section 12 of the

3       agreement, and it's on page 7.

4           And if we start with Section 12.1,

5       "Definition of Confidential Information,"

6       confidential information is all information,

7       all materials received from Regado or

8       C5Research with respect to the REGULATE-PCI

9       clinical trial.

10          And we move down to Section 12.2

11      "Restrictions on Use and Disclosure," that

12      section says that Dr. Kosinski agreed to

13      maintain in strict confidence the

14      confidential information.

15          So there was an agreement between

16      Dr. Kosinski and Regado to maintain all

17      information confidentially.  It definitely

18      means that he must keep the information

19      confidential, which also means that

20      Dr. Kosinski had a duty of trust and

21      confidence to Regado.

22          But this agreement went even further.

23      It went even further than just a promise to

24      keep the information confidential.  It also

25      restricted Dr. Kosinski's ability to use the

1       information for his own benefit.

2           How do you know that?  By examining the

3       agreement in context with the broader

4       clinical trial, by looking at the other

5       agreement he signs, by thinking about the

6       testimony that you heard, and really just

7       using your common sense.

8           So let's start with that first agreement

9       that Dr. Kosinski entered into -- the

10      confidential disclosure agreement, or CDA.

11      It was Government Exhibit 1-B.

12          And remember that this document -- this

13      is a document that Dr. Kosinski signed in

14      order for him to receive information to help

15      him decide whether or not he even wanted to

16      be a principal investigator in the clinical

17      trial.

18          And by signing this agreement,

19      Dr. Kosinski agreed to keep all the

20      information he received confidentially, not

21      to use or disclose the information except to

22      evaluate whether or not he wanted to

23      participate in the clinical trial.  He could

24      not use any of this information for his own

25      benefit.

1          Now, you know that signing this

2     agreement, this document, didn't get him

3     access to things like REGULATE-PCI clinical

4     study data.

5          If you look at Defense Exhibit 3, this

6     email, and the attachments to the email, you

7     know that by signing the CDA, the

8     confidential disclosure agreement, he

9     received things like the investigator

10    protocol, the investigator brochure, and

11    other regulatory documents.

12         So think about how the CDA fits in with

13    the clinical study and research agreement,

14    the CSRA.  You know from Ms. Zito's testimony

15    that the CSRA, that second agreement,

16    controls after Dr. Kosinski signed it,

17    entered into it.  You know he was no longer

18    bound by the obligations of the confidential

19    disclosure agreement, that CDA, which we just

20    saw included use restrictions.

21         So let's look at Section 12 again of the

22    CSRA.  First, let's look at the definition of

23    "confidential information."  Like I said

24    before, it covers all materials, and it

25    covers them whether disclosed prior to or

1       after the effective date of this agreement.

2       So it included information that Dr. Kosinski

3       received when he entered into that first

4       agreement, the CDA.

5       Now, common sense tells you that the

6       CSRA, the second agreement, that the

7       defendant had to sign to become a principal

8       investigator to get even more important

9       information and more confidential information

10      would not lower the restrictions on the

11      information he had already received, and it

12      wouldn't have less restrictions on even more

13      important and new confidential information

14      that he was going to receive.

15      And what do I mean by "more important"

16      or "more confidential"?  Well, let's look

17      closer at the types of confidential

18      information that this document covered.

19      It included the study drug, REG1, the

20      experimental drug, the reason why there was a

21      REGULATE-PCI clinical trial, and basically

22      the reason why there was Regado.  It included

23      all the study data related to the

24      REGULATE-PCI clinical trial.  It included

25      Regado's trade secrets.

1           Confidential information basically means

2       everything related to what you know is the

3       most important thing that Regado is doing:

4       REG1, its lead drug; and the REGULATE-PCI

5       clinical trial, whose success could make or

6       break Regado.

7           Now if go down to the next section,

8       12.2, again it's called "Restrictions on Use

9       and Disclosure," and let's look closely at

10      how it's formulated.

11          First, Dr. Kosinski agreed to maintain

12      in strict confidence all the confidential

13      information, not just keep it confidential,

14      but maintain it in strict confidence, which

15      is something more than an agreement not to

16      disclose the information.

17          Second, after he agrees to maintain the

18      information in strict confidence, the

19      agreement then explicitly sets forth under

20      what circumstances and to whom Dr. Kosinski

21      can disclose information, and that's

22      basically just to the IRB, his Institutional

23      Review Board, and to other people who are

24      under confidentiality obligations and then

25      only on a need-to-know basis.

         Third, the agreement then does not
contain any carve-outs or exceptions for the
use of confidential information.

         And, fourth, Dr. Zelenkofske, the chief
medical officer of Regado -- he was clear
when he testified.  Regado did not
contemplate that any principal investigator
including the defendant would use Regado's
confidential information to benefit
themselves financially.

         And, finally, let's think about this
agreement outside of the context of insider
trading for a second.  Remember confidential
information includes the REG1 study drug.
Surely Dr. Kosinski was not allowed to use
REG1 for his own financial benefit.  He
couldn't just take the formula of REG1, copy
it, call it "FREG1," and administer it to his
patients for a fee.

         The language of the agreement, the
context of the agreement, Dr. Zelenkofske's
testimony, and your common sense leads to the
conclusion that Dr. Kosinski was not
permitted to use the information for his
personal benefit.

1           There was a use restriction in this

2      agreement.  But regardless, the Government

3      has proved and the evidence shows beyond a

4      reasonable doubt that Dr. Kosinski owed a

5      duty of trust and confidence to Regado.

6           So let's come back to the question that

7      I posed:  Did the defendant intentionally

8      violate a duty of trust and confidence to

9      Regado?  And let's look at the evidence that

10     Dr. Kosinski violated his duty by trading on

11     Regado's nonpublic material information.

12          So you know that Dr. Kosinski was sent

13     an email from C5Research on Sunday,

14     June 29th, 2014.  This was the email that you

15     heard about when Ms. Sellers testified, and

16     this email was only sent to principal

17     investigators and study coordinators in the

18     REGULATE-PCI clinical trial.  All evidence

19     shows that this was nonpublic information.

20     Even the defendant's own expert agreed that

21     this was confidential nonpublic clinical

22     information.

23          The email explained that the trial was

24     on hold until Wednesday, July 2nd, and it

25     also told Dr. Kosinski and others that there

had been several allergic reactions over the past few weeks and that leadership needed time to review the events.

Was this information important?  Was it material?  Dr. Kosinski thought so because the evidence showed that, after he received it, the very next day he sold every share of Regado stock that he owned in violation of his duty of trust and confidence to Regado.

If you pull up Government Exhibit 38, you can look at the June 1st to June 30th investment report and see the sale of his Regado stock under "Trades Pending Settlement."

Remember Mr. Scoufis from FINRA?  He told you how it worked -- that Dr. Kosinski sold them on June 30th but it takes a few days for the trades to actually happen or settle.

But you don't have to rely on Dr. Kosinski's sale of his Regado stock to know that the information he received was important because you heard tons of testimony about how allergic reactions were a big deal in the REGULATE-PCI clinical trial.

```
 1          You heard from Ms. Sellers and
 2     Dr. Zelenkofske that the previous trial, the
 3     Phase 2b, or RADAR, trial, was shut down
 4     because of allergic reactions.
 5          You saw the investor protocol manual
 6     which went through in detail the history of
 7     Phase 2, the risks associated with allergic
 8     reactions, and allergic reactions' impact on
 9     the REGULATE-PCI trial.
10          You heard from Dr. Zelenkofske and
11     Ms. Sellers about special training for
12     principal investigators with respect to
13     allergic reactions.  You heard about the
14     investigator meeting in Miami.  You saw that
15     Dr. Kosinski signed in because you saw those
16     sign-in sheets.  And you heard that during
17     that investigator meeting in Miami, there
18     were many discussions related to allergic
19     reactions.
20          Do you remember Ms. Sellers's flowchart?
21     They gave out a laminated version to every
22     principal investigator, and the first
23     question that was asked on this flowchart was
24     whether there was an allergic event.  And
25     then one entire side of the flowchart
```

discussed what to do if there was an allergic
event.

Remember Ms. Sellers told you she worked
on dozens of clinical trials and never had to
collect so much data on allergic reactions as
required in REGULATE-PCI.

You also heard from Dr. Zelenkofske.  He
told you about the presentation he gave in
Miami that was entirely on allergic
reactions.  He testified that Regado was
required by the FDA, the Food and Drug
Administration, to educate the principal
investigators about allergic reactions, that
Regado had to put in place something called a
RiskMAP for allergic reactions.

And you heard Dr. Zelenkofske testify
about how important the success of REG1 was
to Regado and that the public markets,
ordinary investors knew how important REG1
was to the success of Regado.

And then you also heard from the
defendant's own expert who testified that
allergic reactions were a big deal in the
REGULATE-PCI clinical trial.

How else do you know that it was

1         important information, material nonpublic

2         information?

3             Look at what happened when Regado issued

4         a public press release that the trial was put

5         on hold to review recent allergic events.

6         Remember Regado told the public on the

7         afternoon of July 2nd that the trial was put

8         on hold and the next day the stock dropped by

9         more than half of its value and Dr. Kosinski

10        avoided losing $160,000.

11            Now let me just stop for a second to say

12        something quickly about Regado stock and

13        Regado stock options.  You heard Mr. Scoufis,

14        the FINRA rep, tell you about both of these

15        securities.  Regado stock and Regado stock

16        options -- they trade on something called --

17        they trade on national securities exchanges,

18        and I don't think that that's really in

19        dispute.

20            So I want to come back to this chart

21        which shows Count 1 of the indictment.  And

22        you saw the price fell dramatically.  It

23        dropped off a cliff after Regado's public

24        announcement.

25            You see Count 1 on this timeline.

1    Dr. Kosinski receives important secret

2    information.  He violates his duty of trust

3    and confidence by selling Regado shares so he

4    doesn't lose $160,000.

5        But he doesn't violate his duty once.

6    He does it twice, and the second time he does

7    it after he learns someone died.  A month

8    after he first violated his duty to Regado,

9    he got an email.  That's Government's

10   Exhibit 14-A.  And it tells him that someone

11   died in the clinical trial.  If you look at

12   the attachment, there was a letter to

13   investigators which clearly said that someone

14   died from anaphylactic reaction.

15       Now, if you remember, Ms. Sellers told

16   you that anaphylactic reaction was a really,

17   really bad allergic reaction.  And if you

18   look at the other attachment, the SUSAR --

19   the SUSAR states that someone died from an

20   allergic reaction on June 23rd, 2014, just

21   six days, less than a week, before

22   Dr. Kosinski got the email that the trial was

23   being put on hold for allergic reactions.

24   The fact of a death and the timing of the

25   death in relation to the trial being put on

1    hold -- that is information that the public
2    did not have.
3           And you heard the testimony from
4    Ms. Sellers, Dr. Zelenkofske.  You heard
5    them.  You know that this was bad news for
6    the clinical trial and the future of Regado.
7    And Dr. Kosinski -- he knew that it was bad
8    news too, and he didn't think about his
9    patients.  He didn't think about his duty to
10   Regado.  He thought about the money he could
11   make with this information.
12          You know from the evidence that
13   Dr. Kosinski did something pretty
14   sophisticated to take advantage of this
15   inside information.  He bought 50 put
16   options.
17          You also know from the evidence that he
18   tried to buy more but he couldn't.  If you
19   look at Government Exhibit 68, you saw that
20   he placed several orders for puts that went
21   unfilled.  That must have been very
22   disappointing for him.  That limited how much
23   money he could make off of Regado's bad news.
24          And you can see from Government
25   Exhibit 38, his Fidelity statement in July,

only one order for 50 put options was filled.
And when he bought the put options, he
violated his duty of trust and confidence
with Regado.  He bet against Regado's stock
using Regado's own secret important
information.

And you know from the evidence that he
bet correctly.  On August 25th Regado
publicly announced the end of the trial, and
the stock dropped again by more than half its
value.

Dr. Kosinski buying put options, betting
against Regado's stock based on inside
information -- that's Count 2 of the
indictment.

And you know from the evidence that
Dr. Kosinski was eventually able to exercise
his puts and make approximately $3,300.  But
you also know that, if he could have, he
would have made more.  He tried to make more
money.

So let's go back again to the question
did the defendant intentionally violate a
duty of trust and confidence and look at his
intent.

Dr. Kosinski intended to do something he knew was wrong.  He didn't trade on Regado securities accidentally.  He knew he was doing something he wasn't supposed to be doing.

First, we know this from Dr. Kosinski's own words.  He confessed to agent McGoey that he was the one who traded the Regado stock and options, that he didn't feel good about it -- good about the trades at the time he was doing them, and that he did it out of greed and stupidity.

Second, the evidence also tells you that Dr. Kosinski knew it was wrong because he tried to hide that he was trading in Regado stock from the very beginning.

Let's look at Government Exhibit 69, Dr. Kosinski's application to St. Vincent's Medical Center to use the facility to conduct the REGULATE-PCI trial.

St. Vincent's received this on October 31st, and Dr. Kosinski signed it on October 16th.  He affirmatively stated that he did not own any shares in Regado, but he lied, and you know this from his Fidelity

statements and from the chart that

Mr. Scoufis put together.

By the morning of October 16, he already

owned 4,000 shares of Regado, and by day's

end, he owned 6,000 shares.  He didn't share

this information with St. Vincent's.  Yet

there's nothing illegal about him owning

shares of Regado stock.  He didn't want

St. Vincent's to know what he was doing.  And

owe didn't just hide his Regado stock

holdings from St. Vincent's.  He also hid it

from Regado.

In December 2013 he correctly filled out

his financial disclosure form.  At that point

in time, he didn't own more than $50,000

worth of Regado stock; so he didn't need to

declare it.  But you also know from this

document that he had to notify Regado

promptly if anything changed.  Promptly.  The

defendant's expert agreed promptly.

So Dr. Kosinski -- he crossed that

$50,000 threshold in February 2014; yet he

didn't notify Regado promptly.  He waited

seven months to let Regado know he owned more

than $50,000 worth of stock.

1          And remember by June 2014 he owned over

2     a quarter of a million dollars worth of

3     Regado stock, but he didn't notify Regado.

4     He hid his stock ownership until after he

5     sold his entire stake, until after the trial

6     was shut down.  He told them about his

7     ownership not until October 1st, 2014.

8          And, finally, common sense tells you

9     that Dr. Kosinski knew it was wrong to trade

10    on insider information.  Dr. Kosinski was a

11    sophisticated investor, and this wasn't the

12    first time that he traded in stock and

13    options.  You can see this from his Fidelity

14    statements.

15         Again let's take a look at Government

16    Exhibit 38.  Look at the July statement.  He

17    had millions of dollars in his 667 Fidelity

18    account and millions more in another Fidelity

19    account.  He was an active stock trader,

20    especially in the pharmaceutical sector.

21         And Regado put options -- that wasn't

22    the first time he bought options.  And these

23    are just a couple pages from one month of one

24    year of Fidelity statements.  You have two

25    years of Fidelity statements that tell you

the same story.  Dr. Kosinski was a

sophisticated, experienced investor.

Let's turn one last time to the question

did the defendant intentionally violate a

duty of trust and confidence to Regado.  The

answer is yes beyond a reasonable doubt.

Dr. Kosinski committed insider trading.  He

violated his duty of trust and confidence to

Regado by using material nonpublic

information for his financial gain.

And one last time, here is the chart

that I showed you that first morning when we

met -- or afternoon that we met.

Dr. Kosinski received secret important

information because he was a principal

investigator in a drug trial, information

that ordinary investors did not have, and he

used that information to trade in the stock

market so he could make money.  That is what

the evidence showed, and it leads to one and

only one conclusion -- that Dr. Kosinski is

guilty beyond a reasonable doubt.

Thank you.

MR. SPEARS:  Your Honor, we'll just need

a moment to set up.

```
 1              THE COURT:  Should we give the jury a
 2         short break?
 3              MR. SPEARS:  Yes, your Honor.  Thank
 4         you.
 5              THE COURT:  Ladies and gentlemen, please
 6         retire to the jury deliberation room and
 7         abide by your oath.
 8
 9              (Jury panel exited the courtroom.)
10
11              (Recess 10:11 to 10:25 a.m.)
12
13              THE COURT:  Please bring in the jury.
14
15              (Jury panel entered the courtroom.)
16
17              THE COURT:  Would counsel please
18         stipulate to the presence of the entire jury?
19              MS. CHERRY:  Yes, your Honor.
20              MR. SPEARS:  Yes, your Honor.
21              THE COURT:  Thank you.
22              Please be seated.
23              The defense may proceed.
24              MR. SPEARS:  Thank you, your Honor.
25              THE COURT:  You're welcome.
```

CLOSING ARGUMENT BY THE DEFENSE

MR. SPEARS:  May it please the Court, Counsel, members of the jury, good morning.

First of all, thank you for your careful attention to the evidence throughout this case and thank you for your patience throughout the trial as well.  On behalf of Dr. Kosinski, we greatly appreciate your service as jurors.

The last witness to testify in this case was Edward Buthusiem, and Mr. Buthusiem has extensive experience with clinical trials as you heard.  He explained that investors like Dr. Kosinski are not prohibited from buying, owning, or selling stock of a sponsor -- in this case, Regado -- during the course of a clinical trial.

And as the Government conceded in its opening statement, Dr. Kosinski is not on trial for purchasing Regado stock.  The question is whether Dr. Kosinski was prohibiting from trading in June and July of 2014.  Where can we look to find the answer to that question, whether he was prohibited

1　　　　　from trading during those two months?

2　　　　　　　We can look at the contract, and you can

3　　　　　see in the contract -- and we'll talk about

4　　　　　it in some detail -- there were no

5　　　　　restrictions on Dr. Kosinski's use of the

6　　　　　information.  There's no reference at all in

7　　　　　the contract to any limitations on trading.

8　　　　　By the terms of the contract, Dr. Kosinski

9　　　　　was permitted to trade as he did.

10　　　　　　　And we can look at the financial

11　　　　　disclosure form, which is in evidence, and

12　　　　　we'll talk about that as well.  The financial

13　　　　　disclosure form contemplated that

14　　　　　Dr. Kosinski and other investigators could

15　　　　　buy, own, and sell shares.

16　　　　　　　And remember too, members of the jury,

17　　　　　it's the Government's burden of proof in this

18　　　　　case.  The Government has not shown you any

19　　　　　document, any communication to Dr. Kosinski

20　　　　　that stated that he was prohibited from

21　　　　　trading in Regado's stock.

22　　　　　　　By contrast, if you were a Regado

23　　　　　insider like the chief medical officer,

24　　　　　Dr. Zelenkofske, he testified he was subject

25　　　　　to a specific insider trading policy.

1          If you were a member of the Data Safety

2     Monitoring Board, you knew what your

3     limitations were.  The charter that governed

4     the Data Safety Monitoring Board specifically

5     prohibited any trading activity by the

6     members of the DSMB.

7          If you were working for Cleveland

8     Clinic, you also knew because you had the

9     master services agreement that specifically

10    and explicitly stated you can't use

11    information that you receive.

12         And Mr. Buthusiem, our expert, also

13    testified that in clinical trials generally

14    drug trial leadership gets training on

15    trading limitations very frequently.  He had

16    provided that training to drug trial

17    leaderships many times.

18         But investigators like Dr. Kosinski are

19    different.  And Mr. Buthusiem testified that

20    in his experience he had never trained

21    investigators in their limitations on trading

22    activity.

23         That's what this case is about.  It's

24    about the fact that the contract by its terms

25    permitted Dr. Kosinski to trade in Regado,

1    and it's about the fact that the Government

2    cannot prove that anyone ever communicated

3    any limitations on trading to Dr. Kosinski.

4    Consequently, the Government can't prove that

5    Dr. Kosinski acted willfully or that he acted

6    with an intent to defraud.

7         Let's turn to the evidence and start

8    with Dr. Kosinski's agreement.

9         We can all agree that the research

10   agreement, the CSRA, is the document that

11   controls, the controlling contract.  You

12   heard from Terri Zito, the first witness in

13   the case, that explained that the research

14   agreement governed the relationship between

15   Dr. Kosinski and Regado.  But I want to

16   review the history of that agreement.

17   Attorney Cherry touched on it as well, but

18   it's very revealing, and I'd like to walk you

19   through it.  We also touched on this in our

20   opening statement.

21        So recall that in June of 2013

22   Dr. Kosinski was invited to consider

23   participating in the REGULATE-PCI drug trial.

24   In connection with that, he received the

25   confidential disclosure agreement, which he

signed.

This agreement in paragraph 2 has two pieces.  The first is that the recipient of the information needs to hold in confidence and not disclose the information received. That's the shade in blue -- in yellow. Excuse me.

The blue shade goes on to explain that "The recipient. . .shall not use, disclose, or exploit such proprietary information for its own benefit."  So this agreement had a prohibition on disclosing information and a prohibition on using information.

We also know from the terms of this initial agreement from June of 2013 that the parties contemplated that there might be a further agreement down the road.

So, for example, if Dr. Kosinski or any other investigators decided that they were going to actually go forward and become involved in the clinical trial, they would enter into a separate agreement which would govern the relationship.

And so we know what that second agreement is, members of the jury.  It's the

1    research agreement.  We also know that this

2    agreement was prepared by CCF, or Cleveland

3    Clinic Foundation, law department, and

4    there's the name of an attorney and Ph.D.

5    listed there by the name of Gerald Schaefer.

6         So if we fast-forward seven months to

7    January of 2014, we have the research

8    agreement between Regado; Connecticut

9    Clinical Research, which was Dr. Kosinski's

10   company; and St. Vincent's Medical Center,

11   and we have the provision on confidential

12   information.  Attorney Cherry reviewed this

13   with you as well.

14        In this provision, the confidentiality

15   provision, it states that "The facility and

16   principal investigators will maintain in

17   strict confidence all confidential

18   information," and then it lists certain

19   people that can receive that information.

20        The language spills over to the next

21   page, and towards the end of the paragraph,

22   it says:  "The foregoing obligation of

23   nondisclosure will not apply" under these

24   certain circumstances.

25        The point of this is that this paragraph

is about obligations of nondisclosure.  It

says nothing about any restrictions on use.

It's not in the agreement.  You'll have the

agreement.  It's Government Exhibit 4.

You'll have it, and you can see there's no

language that restricts use.

Then if we proceed to see paragraph 28,

which is further in the agreement, it

explains that this is the agreement between

the parties.  There doesn't seem to be any

dispute about that.  And it says that "Any

prior or contemporaneous negotiations, either

oral or written, are hereby superseded."  So,

in other words, the initial agreement from

June of 2013 was superseded by this

agreement.  This is the controlling

agreement.

What can we take away from this history?

First, the June 2013 agreement, the

initial agreement, restricted disclosure and

use; the January 2014 agreement, the

controlling agreement, only restricted

Dr. Kosinski from disclosing information.

Second, we know that Cleveland Clinic

drafted both agreements.  We can see that

here.  We see this reference to CCF,
Cleveland Clinic Foundation, law department,
again Gerald Schaefer.  Cleveland Clinic
drafted this document.  They knew how to
restrict use in clear terms because they had
done so in the initial agreement.  But they
removed that language.  The same attorney
prepared both versions.  They eliminated the
restriction on use from the agreement that
ultimately controlled.

And there's also an explanation, members
of the jury, for why the difference between
the two.

Recall that Terri Zito and Mary Ann
Sellers testified that the purpose of the
initial agreement, the June 2013 agreement,
was to protect, in particular, the protocol
that governed the potential principal
investigators -- to protect the protocol
because the protocol contained confidential
information and proprietary information.

Our expert, Mr. Buthusiem, testified
that the protocol is published.  Once the
clinical trial starts and enrollment begins,
the protocol is published on

clinicaltrials.gov. That's one reason why there was a difference.

But there's no question that there is a difference. The use restriction was removed from the research agreement.

Let's talk about another key document that's in evidence, the financial disclosure form.

Recall that after the initial agreement was signed -- so we're in the period of June, July of 2013 -- Dr. Kosinski and his study coordinator Maria Capasso received the start-up packet from C5Research. And this start-up packet attached a zipped document that contained a lot of material -- the protocol and various regulatory documents.

One of the documents that was attached is Defense Exhibit 3-H, and this was the financial disclosure form. This is a disclosure form that investigators like Dr. Kosinski would fill out if they were to own shares of the study sponsor. And there's a section here that indicates that the investigators can check "Yes" or "No" if they have a significant equity interest in the

1          sponsor of the study, for example, an equity

2          interest in a publicly traded company

3          exceeding $50,000.

4               Why is this significant?

5               Members of the jury, it's significant

6          because, at the very beginning of this

7          process when Dr. Kosinski was evaluating

8          whether to become involved, this form is

9          communicating to him that it's permissible to

10         own shares; to buy, own, and sell shares of

11         Regado's stock.  It says that you just -- you

12         need to disclose it if your interest exceeds

13         $50,000.  It certainly doesn't say that you

14         can't own shares.

15              So the importance there is that from the

16         very beginning Dr. Kosinski was receiving

17         information that indicated that it was

18         appropriate to own shares in Regado.

19              And Mr. Buthusiem's testimony is on

20         point here as well.  He explained that

21         investigators like Dr. Kosinski are free to

22         buy, own, and sell shares of the sponsor like

23         Regado.

24              Another point I want to emphasize is

25         that there's not a single communication to

1          Dr. Kosinski about any prohibition on trading

2          activity.  Again, the start-up packet is

3          informative here.  There are a number of

4          documents that were part of the study packet.

5          This is Defense Exhibit 3 and then 3-A

6          through 3-K.  If it were in hard copy, you

7          would see it's a lot of material.  It's a

8          thick packet.

9          You can see some of the items that we've

10          highlighted here:  The instructions for

11          document completion and protocol.  There's

12          the FDA Form 1572, the financial disclosure

13          form, which we were just looking at.  Nowhere

14          in any of these materials does it indicate

15          any prohibition on ownership of stock or

16          trading in Regado stock.

17          And then as we move through the

18          timeline, recall that Dr. Kosinski attended

19          the investigators conference in February of

20          2014.  And all of the slides are in evidence.

21          There was no presentation made to the

22          investigators while they were there that

23          would have indicated any prohibition or

24          limitation on trading in Regado's stock.  It

25          would have been an opportunity for Regado to

offer some guidance on that.  There's no
evidence that they ever did.

On this same point, members of the jury,
the Government did not call a single witness
that even spoke to Dr. Kosinski during the
clinical trial.

You heard from Terri Zito.  She
testified that she never spoke to
Dr. Kosinski.  You heard from Mary Ann
Sellers.  The same -- never spoke to
Dr. Kosinski.  And Dr. Zelenkofske -- also,
there's no evidence that he had any
conversation with Dr. Kosinski.  And there's
no evidence of any emails to Dr. Kosinski
indicating that there were prohibitions on
this trading activity.

And again recall Mr. Buthusiem's
testimony on this point, and he explained
that in his experience he often trained
executive committee members and drug trial
leadership on the limitations of trading
activity for -- in a study sponsor but he
never trained investigators like
Dr. Kosinski.

So we've looked at the issue from the

investigator's perspective.  Let's put this
in the context of the clinical trial
structure as a whole.

Remember when Mary Ann Sellers
testified, I reviewed with her Defense
Exhibit 4 -- I'm sorry -- Defense Exhibit 29,
which on page 4 had a slide on the "Trial
Organization."  And this is shown on your
screen here.  It shows sections for the
"Academic Leadership" and "Operations."  It
notes that there was an executive committee,
a steering committee.  You can see in the
bottom right corner that what's highlighted
there is the "DSMB," or the Data Safety
Monitoring Board.

Dr. Kosinski was not a member of any of
these leadership entities.  He was not part
of the drug trial leadership.  He was not
part of the DSMB.

And we know also from the evidence that
the drug trial leadership and the DSMB had
very clear limitations on their ability to
trade in Regado's stock.  Recall the
testimony of Dr. Zelenkofske.  He explained
that he was subject to an insider trading

1      policy.

2          Very tellingly is Defense Exhibit 64.

3      This is the charter that governed the DSMB.

4      It's Defense Exhibit 64.  This document shows

5      there was a complete ban on trading if you're

6      a member of the DSMB.

7          So here we have some of the provisions.

8      There's a "Confidentiality" section -- this

9      is in yellow -- that shows that "Members must

10     acknowledge that all reports and meeting

11     records are strictly confidential."  Well, we

12     saw that same "strictly confidential"

13     language in Dr. Kosinski's agreement, but

14     there was more to this agreement.

15         The next section, Section 8, talks about

16     "Conflict of Interest Guidelines."  And it

17     states -- and you can see the blue highlight

18     here -- "Members of the DSMB. . .will not buy

19     or sell stock or stock options in Regado

20     Biosciences" -- it goes on.  It says -- "from

21     the time of the first meeting of the DSMB

22     through the last meeting and until the main

23     study results are made public."

24         So the DSMB was subject to very specific

25     guidelines that told them you can't buy or

1           sell stock options or stock in Regado

2           Biosciences during the clinical trial.

3               There's another agreement in the

4           evidence as well here.  This is Defense

5           Exhibit 65.  This is the master services

6           agreement which controlled the relationship

7           between Regado and Cleveland Clinic.

8               This document has a confidentiality

9           provision as well, and the language of the

10          confidentiality provision explains that the

11          receiving party agrees that it will keep all

12          such information strictly confidential.

13          Again, there's that language "strictly

14          confidential."  We saw that language in

15          Dr. Kosinski's agreement.

16              But it goes on, and it says that the

17          receiving party will not use the information

18          for any other purpose.  So there was a use

19          restriction here as well, and that's

20          highlighted in blue.  That use restriction

21          language is not in Dr. Kosinski's agreement.

22              So why is there this difference?

23              You heard from our expert,

24          Mr. Buthusiem, that the drug trial leadership

25          and the DSMB have access to far more

information.

The DSMB, the evidence showed, had access to all data about all patients from all sites around the world.  So they had a complete trading ban as you saw in Defense Exhibit 64.

And the drug trial leadership had access to far greater information as well.  They had access, for example, to the DSMB's recommendations.  They were involved in key decision-making.  For example, does the executive committee want to accept the DSMB's recommendation?  So they had restrictions on use and disclosure.

But, again, members of the jury, investigators like Dr. Kosinski are different.  Investigators had minimal access to information, and they had a restriction on disclosure accordingly.  As we saw the language in their agreement, it was an obligation of nondisclosure.  They didn't have any restriction on use.

Let's see how this worked in real time in the context of the REGULATE-PCI trial. I'm going to show you a timeline here that

1          focuses on the period from June 23rd to

2          June 29th, 2014.

3               You can see that on June 23rd the

4          evidence showed that a patient died in the

5          Czech Republic.  This patient had been

6          administered the REGULATE-PCI drug REG1.  The

7          next day the DSMB chair reviewed the

8          occurrence, the patient death, and

9          recommended that the trial continue as it was

10         designed.

11              Later that week on June 26th, there was

12         another serious allergic reaction that

13         occurred in Edmonton, Canada.  You heard this

14         from Dr. Zelenkofske's testimony.

15         Dr. Zelenkofske then notified the drug trial

16         leadership about the allergic reaction in

17         Canada.

18              And then in the time frame of June 28th

19         to June 29th, which is a Saturday and Sunday,

20         the DSMB was notified as well.  And so during

21         the course of that weekend the drug trial

22         leadership was waiting for the DSMB's

23         recommendation.

24              Then we know on June 29th from Defense

25         Exhibit 43 and also from Dr. Zelenkofske's

1              testimony that Duke Clinical Research and C5,

2              or Cleveland Clinic, were discussing what to

3              tell the investigators at that point because

4              they hadn't heard from the DSMB.  So they

5              were wondering what do we -- how do we

6              message this?

7                   Remember one idea was, well, we can just

8              tell the investigators the system is down for

9              maintenance.  But ultimately that's not what

10             they did.

11                  As you know from the evidence,

12             Government Exhibit 10, at 4:00 p.m. Cleveland

13             Clinic notified the investigators of the

14             two-day suspension of enrollment due to

15             several allergic reactions.

16                  What can we take away from this

17             timeline?

18                  Well, it's clear from the timeline that

19             the DSMB and the drug trial leadership had

20             access to information and were involved in

21             critical decision-making.  They knew about

22             the death that occurred in the Czech Republic

23             within 24 hours, and they decided to continue

24             with the drug trial.  They knew about the

25             allergic reaction in Canada within 24 hours.

But investigators like Dr. Kosinski --
it was very different for them.  They weren't
involved in any of these behind-the-scenes
discussions.  In fact, the investigators
didn't learn about the patient death in the
Czech Republic for another five weeks, and
there's no evidence that the investigators
like Dr. Kosinski ever found out about the
fact that there had been another serious
reaction in Canada.

The bottom line, members of the jury, is
that those with access to key data and
decisions had significant restrictions on
what they could do with information that they
received.  They couldn't use it -- in the
case of the DSMB, they couldn't buy or own
any shares of Regado.  But investigators were
different.  They had minimal access, and they
didn't have a restriction on use, and you can
see that from the agreement.

Another point I'd like to review with
you is the fact that investigators like
Dr. Kosinski had every reason to expect that,
if Regado was providing them significant
information related to the progress of the

1    drug trial, it would also disclose that

2    significant information and those significant

3    developments to the public.

4         There are multiple examples in the

5    record of how this happened.  Before I review

6    those with you, recall that the stock

7    market -- and in this case, the Nasdaq, which

8    is the exchange that Regado traded on --

9    opens at 9:30 in the morning and closes at

10   4:00 p.m.  You heard that from Mr. Scoufis,

11   who testified.

12        Well, let's look at how this works.  So

13   on July 2nd -- this is Defense Exhibit 47 and

14   47-A -- July 2nd at 4:28 p.m., the executive

15   committee sends a letter to the

16   investigators.  This is at a point when the

17   market had closed.  It was after

18   4:00 o'clock.  And in this letter the

19   executive committee is notifying the

20   investigators of recent potential serious

21   allergic reactions and that they've decided

22   to continue the pause, and it also references

23   that there's going to be a complete

24   assessment of all -- of efficacy and safety

25   data on all enrolled patients and that's

going to occur within the next several weeks.
So that was at 4:28 after the market closed
on July 2nd.

Later that afternoon, Regado makes a
similar announcement to the public.  They
talk about the initiation of the DSMB review.
It talks about how it was an unplanned
review, and there's more text in here as
well, but they talk about how they're going
to be reviewing the data for all patients to
date, which was 3,234 with the focus on
serious adverse events.

Let's talk about July 9th.  A very
similar pattern.  So we have here on
Wednesday, July 9th after the market has
closed at 4:25 p.m., there's a letter from
the executive committee to the investigators
and the study coordinators.  A letter's
attached here.  This is Defense Exhibit 50-A.
The letter explains:  "After meeting today
with the FDA, the trial has been put on
'formal clinical hold.'"

So when does the public found about
this?  Well, in this case they actually found
out several minutes before the investigators

but again after the market had closed. On
July 9th at 1605, which is military time for
4:05 p.m., Regado announced the clinical hold
just as they were telling the investigators.

Another example:

August 25th -- this is a Monday -- at
6:47 in the morning, there's an email, and
attached to the email is Defense
Exhibit 84-A. And this email includes a
letter to the investigators. You can see the
date of the letter is August 24th. So that's
a Sunday. The stock market's closed on
Sunday. This letter explains that the DSMB
is recommending that the REGULATE-PCI trial
as currently designed be stopped, no further
patients enrolled. So that was a Sunday.
Market closed. Investigators get this
letter.

When does the public find out about
this? The very next morning, August 25th,
6:30 a.m., before the market opens, Regado
makes a similar announcement about how the
trial's being permanently halted.

There's another example here of the
public hearing about a development before the

1　　　　investigators by a few days.  This is in

2　　　　evidence here.  This is Defense Exhibit 79.

3　　　　　　　You can see that on May 14th, 2014,

4　　　　Regado was, in this instance, announcing good

5　　　　news, stating that they were pleased to have

6　　　　reached their first milestone and that the

7　　　　drug trial was proceeding as they had hoped

8　　　　it would at that point.  This was in May of

9　　　　2014.  And there's reference to the fact that

10　　　they had reached the 1,000-patient milestone.

11　　　May 14th, 8:30 a.m.

12　　　　　　When do the investigators find out about

13　　　this?  Well, Government Exhibit 9-B includes

14　　　as an attachment this email May 16th.  So two

15　　　days later the investigators learn that the

16　　　DSMB had met on May 13 and based on this

17　　　review they've recommended that the trial

18　　　continue.  It talks about the first 1,000

19　　　patients.  Congratulations.

20　　　　　　So this is an example of the

21　　　investigators finding out about important

22　　　developments after the public had received

23　　　the announcement.

24　　　　　　What does this mean?  It means that,

25　　　when the drug trial leadership sends

investigators an update on the drug trial and the market is closed, the investigator would have reason to believe that a public announcement would be made if there was something important to say.

In this case, the Government has focused on two emails, and we'll talk about them in a moment -- June 29th and July 29th.

Each was sent to the investigators when the stock market was closed, but Regado did not issue a press release. If Regado thought the information in those emails was important to its shareholders, it would have made a public announcement the way they usually did. We just saw the multiple examples. In this case Regado chose not to.

Let's turn to some of the Government's arguments that have been shared with you this morning.

First of all, allergic reactions: Attorney Cherry told you about allergic reactions and how they were a serious risk and the investigators were told about that risk and sort of keyed into that risk.

The first point: The risk of allergic

reactions was well publicized.  This was no
secret.  As you heard, this was a Phase 3
drug trial.  The Phase 2, or the RADAR phase,
had actually been shut down because of three
allergic reactions.  They stopped it.  But
reports were published about that.  Two of
them are in evidence, Defense Exhibit 61 and
62, and Dr. Zelenkofske testified there were
multiple manuscripts in the public record
that talked about allergic reactions.  So
this wasn't any great secret that there was a
risk of allergic reactions.

Second point:  The fact that allergic
reactions occurred was not of itself
significant, and there's a good example of
this.

If you remember Mary Ann Sellers's
testimony, she talked about that phase of the
drug trial, the REGULATE-PCI, when they were
reviewing the 1,000 patients.  During that
period of time, she testified there were
actually three allergic reactions.

And we know from the press release that
we just looked at -- and we can look at it
again -- that Regado was very pleased with

1     the results of the first 1,000-patient

2     enrollment.  They hit their milestone, and

3     they were going to continue as planned.  This

4     was a good report that came out.  We're

5     looking at Defense Exhibit 79.

6          So the point is that there had been

7     three allergic reactions, and not

8     withstanding that, the prospect was still

9     good for the drug trial at that point in

10    time.

11         What's interesting is that even the

12    patient death that occurred in the Czech

13    Republic didn't lead the DSMB to recommend

14    that the trial should stop.

15         So here's a letter dated July 28th.

16    This is Government Exhibit 14-B, and attached

17    to this is the suspect adverse reaction

18    report.  It makes reference to "Reaction

19    Onset," which we've highlighted there, on the

20    23rd of June 2014, and then on the next page

21    it explains that the outcome of the reaction

22    was fatal.

23         But it also explains that the very next

24    day, on June 24th, the DSMB chair had

25    reviewed the incident and recommended that

1    the trial continue as designed.

2    So what's the point?  The point is that

3    allergic reactions were a well-publicized

4    risk and the fact that allergic reactions

5    occurred was not of itself significant, and

6    there are examples of that.

7    Let's talk for a moment about the

8    June 29 and the July 29 emails that Attorney

9    Cherry had reviewed with you.  These are the

10    emails that the Government claims conveyed

11    material nonpublic information to

12    Dr. Kosinski and many others.  But the

13    information, members of the jury, in these

14    emails is fundamentally different from the

15    press releases that caused the steep drop in

16    the price.

17    Let's walk through this.  Let's start

18    with the Government's chart that is in

19    evidence.  It's Government Exhibit 60.

20    You'll recall this chart.  And let's focus on

21    the blue box on the left.

22    June 29th, 2014 -- that's the date of

23    the email.  This box summarizes it this way:

24    "Dr. Kosinski receives email re:  severe

25    allergic reactions and a hold on acceptance

of new subjects."

Well, first of all, let's look at the email itself because this isn't really a proper characterization of what the email said.

Here's the email. On pages 2 and 3, the email explains that "There have been several," not severe -- "several allergic reactions." And then it also notes that the hold is going to last until a specific time -- Wednesday at noon. It's a two-and-a-half day hold.

Again, there have been reports of allergic reactions previously, and that didn't lead to the drug trial being shut down. We also heard from Mr. Buthusiem that short pauses such as this are common in drug trials. And Dr. Zelenkofske testified as well that there had been short pauses during the course of the REGULATE-PCI trial.

Question: Was the information in this email even a significant development?

Well, we know that Regado chose not to make a public announcement; so you can infer that it was not a significant development

from the standpoint of what shareholders
should be made aware of.

Let's focus on the period of time after
this email.  Going back to the Government's
chart, Government Exhibit 60, so the red box
indicates the point at which Dr. Kosinski
sold his shares.  It was at 9:21 in the
morning.  And then the yellow box is the
point at which the public was made aware of
certain information.

But what the Government hasn't focused
on is all the information that occurs in
between the red box and the yellow box, all
of the developments that occurred after
Dr. Kosinski sold his shares.

Let's look at a timeline.  Again, this
is June 30th through July 2nd, 2014.

On June 30, Dr. Zelenkofske testified
that the DSMB chair recommended that the
trial continue.  This is the same day that
Dr. Kosinski sold his shares.  The
recommendation, according to
Dr. Zelenkofske's testimony, was that the
trial continue despite the fact that there
had been a patient death in the

1      Czechoslovakia -- the Czech Republic and

2      despite the fact that there had been a second

3      serious allergic reaction in Canada.  That

4      was the recommendation as of June 30 --

5      continue with the trial.

6           That same day the executive committee

7      met and decided to ask for more information

8      from the DSMB.

9           Then two days later on July 2nd the

10     executive committee met with the DSMB chair

11     and the Regado CEO.  Now the DSMB changed its

12     recommendation and decided that there needed

13     to be a full review of all data for all

14     patients.  That's what Dr. Zelenkofske

15     testified to.

16          Then according to Dr. Zelenkofske's

17     testimony, the drug trial leadership accepted

18     the DSMB's recommendation.  Later that day on

19     July 2nd, Regado decided to issue a press

20     release.

21          The market closes at 4:00 p.m.  Then at

22     4:28 p.m. the drug trial leadership tells the

23     investigators about an unplanned DSMB review

24     of all patients and that the suspension of

25     the drug trial was likely to last for several

weeks.

Similarly, the press release goes out from Regado and announces to the public the same thing: the DSMB's unplanned review, prolonged suspension of the drug trial. The language is slightly different in the press release. It talks about the suspension occurring for as much as eight weeks while the DSMB conducted its review.

Dr. Zelenkofske testified about the behind-the-scenes discussions and meetings occurring up to the point of 4:00 o'clock on July 2nd. Dr. Kosinski wasn't part of any of those discussions.

Here's the press release announcing the initiation of the unplanned review on July 2nd. This is the date before the steep drop that's shown on the Government's chart. It talks about the review occurring within the next eight weeks and the full analysis of all data concerning all patients, 3,234.

The bottom line, members of the jury, is that there's a big difference between the June 29th email that was sent to the investigators and the July 2nd press release.

1           The Government wrongly assumes that those two

2           contain the same information.  They didn't.

3           And this was a flawed premise from the

4           beginning.

5                You may remember when Mr. Scoufis was

6           testifying from FINRA he was shown Defense

7           Exhibit 60 and 60-A, which was a FINRA

8           response report, some data that Regado

9           provided to FINRA upon FINRA's request.  Then

10          FINRA compiled that data into a report.  It's

11          hundreds of pages.

12               I'm going to show you one page of this.

13          This is the chronology response report, and

14          it talks about an event date of July 2nd, and

15          it talks about the news, and the news

16          indicated there is the DSMB's unplanned

17          review.  It's the press release on July 2nd.

18               But it does more than that.  It also

19          says that there was a date of awareness of

20          June 29th, 2014, and Dr. Kosinski is listed

21          here.  His colleagues are listed here as

22          well.  And there are many other people that

23          are listed in this report because it's

24          hundreds of pages long.  I just chose this

25          page.

But what's the point here?  The point here is that this report is assuming that Dr. Kosinski received the press release of July 2nd and that he was aware of that on June 29th.  It can't be.  The news in the July 2nd press release did not exist on June 29th.

What about the July 29th email?  It's a similar problem, members of the jury.

Here's the Government's charts, Government Exhibit 61.  Let's start again with the blue box.  Dr. Kosinski receives email re:  trauma-related death and that the trial is on hold.

So, first of all, let's talk about the blue box.  First of all, we know that 20 days earlier the public was told that the trial was on hold.  So that wasn't any new information.  Recall the press release "Clinical Hold of REGULATE-PCI."  This is July 9th at 4:05 p.m., 20 days before this email.

So what new information was provided in this July 29th email?  The new information was that a patient had died in the Czech

1    Republic.  And here is Government

2    Exhibit 14-B which explains that in the

3    suspect adverse reaction report.

4         But again notice the highlighted

5    language.  It talks about how the event --

6    the outcome was fatal, but it also talks

7    about how the DSMB chair had reviewed it and

8    recommended that the trial continue as

9    designed.  So the new information was that a

10   patient had died, the DSMB chair had reviewed

11   that and believed as of June 24th that the

12   trial could continue as designed.

13        Let's go back to the Government's chart,

14   Government Exhibit 61.  And let's focus now

15   on the period in between Dr. Kosinski's

16   purchase of the options on July 31st and the

17   25 days' expanse to August 25th because the

18   Government hasn't focused on that period of

19   time but it's critical to analyze that.  And

20   again we've prepared a third timeline here to

21   address this period of time.

22        What do we know from the evidence?

23   During the period from August 1st to

24   August 21st, we know that the DSMB was

25   continuing its unplanned review.  It was

reviewing all of the data for the 3,200-plus patients.  That's what's was ongoing during this period of time.  We also know from the evidence that the Data Safety Monitoring Board completed that review on August 21st and they met on that date to consider it.

Then in the days that followed, in the August 21st to August 24 period of time, the DSMB recommended that Regado stop the drug trial.  That's the first time the DSMB had recommended that the drug trial stop.  During that same period, the executive committee evaluated the DSMB recommendation, and they accepted it.

What happens next?  Now we get to the communications to the investigators and the public.

August 24th was a Sunday.  The stock market's closed.  The executive committee tells the investigators that the drug trial's being stopped permanently.  The next morning at 6:30 in the morning before the market opens, Regado publicly announces that the drug trial is being halted permanently following the results of the DSMB review of

all those patients.

And here are some of the exhibits that go along with it.  This is the August 24th letter that talks about when the DSMB met, the DSMB's recommendation, the executive committee's acceptance of that recommendation, and the decision to stop the drug trial.

The press release, again just so you can see that, talks about the same thing.  It's a permanent termination of enrollment based on the DSMB's analysis.  There were serious allergic adverse events associated with the drug, and there was a frequency and severity that caused the DSMB to conclude that the trial should be halted.

The point is that, on August 25th when you saw that steep drop in price, the market was reacting to the news that the DSMB had completed its review, recommended that the trial end, and Regado was announcing that the drug trial was over.

There's a huge difference between the July 29th email and the August 25th press release.  The information conveyed in the

1    press release didn't even exist on July 29th.

2         On this subject, I'd like you, members

3    of the jury, to consider Agent McGoey's

4    testimony in the Grand Jury because he didn't

5    provide the Grand Jury accurate testimony.

6    He was under oath, and he was asked questions

7    about this time frame.

8         First, under oath, Agent McGoey told the

9    Grand Jury that through the July 29 email,

10   Regado was telling the investigators, quote,

11   "They were stopping the drug trial due to

12   this death that had happened," end quote.

13   That was not correct.

14        The July 29 email noted that a death had

15   occurred but also stated that the DSMB was

16   willing to continue with the drug trial.  You

17   can look at Government Exhibit 14-B.  There's

18   nothing in that exhibit about Regado telling

19   investigators that they were stopping the

20   trial due to this death that happened.

21   Regado had not decided to stop the drug trial

22   at that point.

23        Second, again under oath, Agent McGoey

24   was asked a question and provided an answer

25   as follows:

1           "QUESTION:  And then on

2           August 25th, Regado publicly announced

3           that someone had died in the trial and

4           that they were putting the trials on

5           permanent hold?

6           "ANSWER:  That's correct."

7           But that was not correct.  You have

8           Defense Exhibit 55 in evidence.  Regado was

9           announcing that the drug trial was over and

10          said nothing about the patient death.

11          The key point from this, members of the

12          jury, is that these steep drops that are

13          shown in the Government's chart are caused by

14          not information in the emails that

15          Dr. Kosinski received but by very significant

16          events that occurred after he traded, for

17          example, the fact that the drug trial was

18          being halted permanently.

19          Let's move to another subject.  Attorney

20          Cherry emphasized the telephone conference

21          between Agent McGoey and Dr. Kosinski.  So,

22          first of all, there's some context here

23          that's in evidence that I want to review with

24          you that's notable.

25          The evidence showed that on June 14th of

1    2016 Agent McGoey and Dr. Kosinski met in

2    Dr. Kosinski's office, they spoke for an hour

3    and 20 minutes, and they talked about the

4    Regado trades.  That was in June of 2016.

5         Six weeks later, Agent McGoey called

6    Dr. Kosinski and told Dr. Kosinski that he'd

7    been indicted, and Dr. Kosinski reacted to

8    that.

9         But let's think about this.  A person

10   finding out that he had been indicted would

11   naturally tend to second-guess themselves.

12        If the FBI told someone they had been

13   indicted for something that happened two

14   years earlier, a person might wonder for a

15   moment "What did I do?  Did I do something

16   wrong as the FBI is suggesting?"  That's all

17   this is.  This isn't a confession, members of

18   the jury.

19        Agent McGoey told Dr. Kosinski he had

20   been indicted and charged with financial

21   crimes from two years back.  Dr. Kosinski was

22   second-guessing himself.

23        We also know from the record that Agent

24   McGoey didn't ask any specific questions

25   about Dr. Kosinski's conduct.  It was a very

```
 1        short call, and it was a telephone call; so
 2        no documents were shown to Dr. Kosinski.
 3             The bottom line is, from this
 4        conversation, there's no substance to
 5        Dr. Kosinski's reaction to the news that he
 6        had been indicted.  It's not a confession as
 7        the Government has suggested.
 8             The financial disclosure form -- let's
 9        return to the financial disclosure form for a
10        moment.  Again, we submit that this financial
11        disclosure form fully supports our defense.
12             The Government's response to this form
13        is that, well, Dr. Kosinski should have
14        filled this out sooner, wasn't prompt enough.
15        That's the Government's response.
16             Let's look at the evidence and make sure
17        we understand the chronology of how this form
18        was filled out.
19             So in December of 2013, Dr. Kosinski
20        signed the first form.  As Attorney Cherry
21        acknowledged, there's nothing wrong with
22        this.  At the time he didn't own more than
23        50,000 shares of Regado.  So he's not
24        disclosing the ownership because the form
25        doesn't ask him to.
```

1          This is right around the time -- this is

2     about a month before Dr. Kosinski became

3     involved as an investigator.  Remember the

4     research agreement was signed the next month,

5     at the end of January of 2014.  So at the

6     beginning of the process, Dr. Kosinski

7     accurately completes the form.

8          At the end of the process, Dr. Kosinski

9     receives a close-out letter from Cleveland

10    Clinic.  It's addressed to Dr. Kosinski and

11    his study coordinator Maria Capasso.  And one

12    of the bullets here references the financial

13    disclosure form.  It talks about an

14    investigator having relevant financial

15    interest changes for one year following

16    termination of study and to please send

17    updated financial disclosure forms to Regado,

18    and there's an email address there.  That was

19    September 29th, 2014.

20         What does Dr. Kosinski do?  Two days

21    later Dr. Kosinski fills out the form

22    accurately, explains that he had a

23    significant equity interest in the sponsor of

24    the study -- that would be the Regado.  And

25    then it says, you know, for example, stock

options and any equity interest in a publicly
traded company exceeding $50,000.  Checks
"Yes" and indicates "Stock ownership."  This
was signed on October 1st, 2014.  There's no
dispute about that.

Members of the jury, Dr. Kosinski wasn't
trying to hide anything.  He disclosed his
ownership to Regado two days after they asked
for this information.  Dr. Kosinski was not
trying to hide anything.  He had nothing to
hide.

And also, by the way, he purchased the
shares in his own name.  If Dr. Kosinski was
trying to hide his ownership from Regado, why
did he buy and sell stock in his own name?

And he had the joint account; so it was
in his name and the name of Deborah Mayer.
There's no indication that Dr. Kosinski was
trying hide his ownership or any of the
transactions he engaged in.

What about Government Exhibit 69?  This
is the application to St. Vincent's.  The
Government tries to make a big deal about
this application.  In reality, it sheds no
light on anything.  What we know from the

record is that Maria Capasso prepared this
form in September of 2013 before Dr. Kosinski
owned his shares of Regado.

Here's an email that's in evidence.
It's Defense Exhibit 8, and it's an email
chain.  In the middle of the chain, there's
an email I would like to focus your attention
on.  It's from Maria Capasso.  It's dated
September 25th, 2013, and it's addressed to
Blair Martin, who we learned was working for
Cleveland Clinic.

It says:  "I am working on my submission
to the medical center for administrative
approval."  So we know that Maria Capasso was
working on that form as of September 25th.

Now, the Government focuses on the
signature page that bears Dr. Kosinski's
signature and the date of October 16th, 2013.
But what he signed was a certification of
certain commitments.  Those certifications
did not refer to his financial disclosure.

You have the document.  You can see what
he was certifying.  It wasn't a certification
of financial disclosure.

In any event, members of the jury, if

1              this document really helped the Government,

2              they would have subpoenaed someone to explain

3              it.  We know Maria Capasso prepared it.  We

4              never heard from her.  We know St. Vincent's

5              Medical Center received it.  We never heard

6              from anyone from St. Vincent's.

7                   It's the Government's burden of proof in

8              this case.  The Government didn't call a

9              witness who had firsthand knowledge about

10             this form.  Instead they put this particular

11             document in through Mr. Scoufis from FINRA

12             who knew nothing about it.

13                  This document is an ultimate red

14             herring.  It was prepared eight months before

15             the conduct at issue.  It says nothing about

16             the issues in this case.

17                  The Government has talked about this

18             loss avoidance amount of $160,000.  The claim

19             here is that, by selling Dr. Kosinski's

20             shares on June 30th, he avoided losses of

21             $160,000.

22                  Well, first of all, the problem with

23             that number is that it assumes that the

24             market would react to the June 29th email the

25             same way it reacted to the very different

1    July 2nd press release.  So that's one

2    problem.  We really don't know how the market

3    would have reacted to the June 29th email.

4         But what about gain?  The Government

5    sticks to the loss avoidance figure, but they

6    never talked about the gain.  And it was

7    surprisingly Mr. Scoufis from FINRA never

8    calculated a gain.

9         You recall he was asked by my colleague

10   Mr. Manning about gain, and Mr. Scoufis

11   hadn't made that calculation.  But he had

12   reviewed the financial records, and he had

13   reviewed the Fidelity statements including

14   the June 2014 statement, and the calculation

15   was right there.

16        Let's look at this.  So this is

17   Government Exhibit 38.  There's one of the

18   pages.  It's a very lengthy document, but

19   there is within that the June statement.

20        And the June statement has a page that

21   talks about Dr. Kosinski's holdings in

22   Regado.  You can see here it talks about the

23   quantity being 40,000 shares and the total

24   cost basis, which is what Dr. Kosinski paid

25   for the shares, $2,053,840.11, and then the

total value on June 30th, 2014, $271,600.

What's the gain?  It's the difference between what the value was on June 30th and what it cost Dr. Kosinski.  $17,759.89.

The Government wants you to think about this loss avoidance figure of $160,000.  We submit that it's not a fair calculation. They didn't want to show you the gain.

And I just want to point out with this document that the total value is of June 30th at the close of the market.  And so, as we know, Dr. Kosinski sold his shares at 9:21 a.m., but this is a good approximation, we submit, of what the gain was.

Another point I would like to address is the reference to Dr. Zelenkofske's testimony by Attorney Cherry in her closing remarks. She said that Regado didn't contemplate that Dr. Kosinski would buy and sell shares of Regado.

Well, I want to point out again that the contract did not prohibit him from doing that.  The financial disclosure form contemplated that he would.  And Dr. Zelenkofske told you that he wasn't

involved in regulatory and compliance
matters.  Interestingly, recall his testimony
in cross-examination.  He didn't even know
about the financial disclosure form.

Before concluding, I would like to
summarize the evidence in the context of the
elements of the evidence.  Judge Bryant will
define those elements for you.

When we put the evidence in the context
of the elements of the offense, it's clear
that the Government's case is flawed on
multiple levels.

Willfulness:  The Government must prove
beyond a reasonable doubt that Dr. Kosinski
acted willfully, and the Government has
claimed in their closing remarks that
Dr. Kosinski knew what he was doing was
wrong.

How could he have known what he was
doing was wrong?  He did what the contract
allowed him to do.  The contract didn't
restrict Dr. Kosinski from trading.  The
financial disclosure form contemplated that
he could buy, own, and sell shares.  He was
never trained on trading restrictions.  He

was never put on notice.

On this record, there's nothing in the
record to indicate that he was ever put on
notice about trading restrictions.  How could
he have known what he was doing was wrong as
the Government has argued?

Compare Dr. Kosinski's agreement with
the others.  In contrast to the Data Safety
Monitoring Board, Dr. Kosinski's agreement
did not prohibit stock ownership.  In
contrast to Regado's officers like
Dr. Zelenkofske, Dr. Kosinski was not subject
to any insider trading policies.  In contrast
to the Cleveland Clinic employees,
Dr. Kosinski's agreement did not prohibit use
of information.

On these facts, the Government cannot
prove willfulness.  Their claim that
Dr. Kosinski knew what he was doing was wrong
makes no sense on this record.

Nonpublic information:  This element
presents a serious problem for the Government
too.  Think about the emails from
July 29th -- June 29th and July 29th.
Nothing about them indicates that they were

confidential.  There are documents in
evidence that bear the stamp of
confidentiality.

This is the protocol, for example.  You
can see that it's stamped
"Confidential/Proprietary."  There's a
"Confidential Statement."  This is the
protocol signed in the beginning of the case.

The June 29 and July 29 emails were not
stamped confidential.  Why not?  Well,
because they don't bear any resemblance to
being confidential.

Look at the emails.  Remember the "Bcc"
line.  This email was blasted to hundreds of
investigators and study coordinators.  And
you know from Mary Ann Sellers's testimony
that, beyond this, numerous other people
needed to be made aware of these
developments -- nurses, pharmacists, cath
labs, all of these people -- IRB -- all of
these people needed to be made aware of this
development.  This document doesn't have the
look and feel of a confidential document.

Interestingly, on this point,
Dr. Zelenkofske was asked questions about

1       this by Attorney Cherry.  She asked, "Were

2       you concerned about this -- the email getting

3       out -- the June 29th email getting out?"  I

4       think was the question.  Dr. Zelenkofske

5       said, "No, I wasn't.  Our concern was patient

6       safety and making sure the investigators knew

7       the status of enrollment."

8            Duty of trust and confidence:  This is

9       another element that poses more problems for

10      the Government's case.  The Government seems

11      to claim that, by using confidential

12      information, Dr. Kosinski breached a duty of

13      trust and confidence.

14           But, again, the Government has not

15      proved beyond a reasonable doubt that the

16      June 29 and July 29 emails were confidential

17      in the first place.  We just reviewed that

18      evidence.  No stamp of confidentiality.  You

19      can see the wide audience.  Without a

20      violation of the confidentiality agreement,

21      Dr. Kosinski cannot have violated the duty of

22      trust and confidence.

23           Materiality:  The Government must also

24      prove materiality beyond a reasonable doubt.

25      Recall the way that Regado communicated

1    developments in the clinical trial.  When a

2    significant development occurred, Regado

3    would do two things.  It would notify the

4    investigators, and it would notify the

5    public.  It would make a public announcement.

6    Usually that would occur when the market was

7    closed, and we reviewed the multiple examples

8    of how that happened.  Notify investigators.

9    Notify the public in roughly the same time

10    frame.

11        Recall the testimony from Mr. Buthusiem

12    on this subject.  He explained that important

13    developments get conveyed to investigators

14    like Dr. Kosinski and the public at the same

15    time, usually when the market's closed.

16        What does this tell us about

17    materiality?  When Regado releases important

18    information to investigators, it notifies the

19    public at roughly the same time.  But Regado

20    did not issue a press release corresponding

21    with the June 29 and July 29 emails.  Why?

22    You can infer from that fact, from the fact

23    that there were no press releases

24    corresponding with those emails, that the

25    information was not material.

1          Intent to defraud:  Finally, the

2     Government must prove beyond a reasonable

3     doubt that Dr. Kosinski acted with an intent

4     to defraud, another element.  The focus is on

5     Dr. Kosinski's intent.  Ask yourselves where

6     is the evidence that Dr. Kosinski intended to

7     defraud or deceive anyone?

8          He followed the terms of the research

9     agreement.  He did what Regado asked under

10    the terms of the research agreement, and

11    there was no restriction on using or trading

12    on that information.

13         There was a restriction on Dr. Kosinski

14    disclosing information, but there's no

15    evidence that Dr. Kosinski ever disclosed

16    confidential information to anyone.

17         The Government has not established

18    beyond a reasonable doubt that Dr. Kosinski

19    acted with an intent to defraud.

20         Members of the jury, as you can

21    appreciate, this is a matter of tremendous

22    importance to Dr. Kosinski.  We thank you for

23    your service on this jury, for your careful

24    attention throughout the trial, and on behalf

25    of Dr. Kosinski, we thank you in advance for

1     carefully evaluating and thinking about the

2     evidence that you've heard in your

3     deliberations because, on close inspection of

4     this evidence, it becomes clear that the

5     Government cannot prove its case beyond a

6     reasonable doubt.

7          The Government will have the final word

8     in these closing arguments.  That's the way

9     our system works.  But at the end of the day,

10    the Government cannot overcome certain key

11    pieces of information.

12         The contract -- the contract did not

13    prohibit Dr. Kosinski from trading.  By its

14    terms, it permitted it.

15         The financial disclosure form

16    specifically contemplated that an

17    investigator like Dr. Kosinski could buy,

18    own, and sell shares of Regado.

19         At the end of the day, there's simply no

20    evidence that anyone communicated any

21    limitations on trading to Dr. Kosinski.  He

22    was required to disclose his ownership if it

23    exceeded $50,000, which on October 1st, 2014,

24    he did because he had nothing to hide.

25         Members of the jury, do these facts make

1    you hesitate?  Do you hesitate with thinking

2    about whether the Government has proved its

3    case?  Respectfully, you should hesitate, and

4    that's why the Government cannot prove its

5    case beyond a reasonable doubt.

6         For these reasons, we ask that you

7    return the only verdict -- the only possible

8    verdict that's consistent with the evidence,

9    the law, and the Government's burden of

10   proof -- a verdict finding Dr. Kosinski not

11   guilty.

12        Thank you.

13        THE COURT:  Would the Government like a

14   moment to set up?

15        MR. FRANCIS:  I would, your Honor.

16        THE COURT:  All righty.

17        Ladies and gentlemen, once again please

18   retire to the jury room and abide by your

19   oath.

20

21        (Jury panel exited the courtroom.)

22

23        (Recess:  11:27 to 11:44 a.m.)

24

25        THE COURT:  All righty.  Please bring in

1          the jury.

2

3              (Jury panel entered the courtroom.)

4

5              THE COURT:  Would counsel please

6          stipulate to the presence of the entire jury?

7              MS. CHERRY:  Yes, your Honor.

8              MR. SPEARS:  Yes, your Honor.

9              THE COURT:  Please be seated.

10             You may begin.

11             MR. FRANCIS:  Thank you, your Honor.

12             THE COURT:  You're welcome.

13

14      REBUTTAL ARGUMENT BY THE GOVERNMENT

15

16             MR. FRANCIS:  Ladies and gentlemen, good

17         morning.

18             I'm the last lawyer that gets to talk to

19         you, which is another way of saying I'm the

20         last lawyer you have to listen to.  Thank

21         you.  I'll be brief.

22             The defense put a lot in front of you in

23         an hour.  I'm not going to take that long.

24         I'm not going to take anywhere close to that

25         long, but I'm going to respond to some of

those points.

The defense raised the elements.
Attorney Spears, I think he said, summarized
those elements. One of those elements is the
duty of trust and confidence. He spoke about
that. You've heard about that from the
Government as well, from AUSA Cherry in her
opening.

The Government's reading of why
Dr. Kosinski had a duty of trust and
confidence is based on a plain reading of
just the words on the page in the CSRA.

Now, that was written by a lawyer. It's
got legal-sounding words in it. It's kind of
long. It probably has too many words in it.
It's easy just to sit back and say, "Well,
I'll let the lawyers tell me what it means."

You can look at it, and it says it right
there. The CSRA, page 7 -- we keep coming
back to the same provision. The defense
keeps skipping over -- they keep skipping
over the title "Restrictions on Use and
Disclosure."

Now, maintaining information --
maintaining confidential information of

Regado in strict confidence is a use
restriction, but you don't even need to get
that far.  You need to find a duty of trust
and confidence.

Dr. Kosinski -- he only got this
information because he signed this agreement.
This agreement says he can take everything
they give him, everything they give him,
including things like the drug.  The physical
drug -- he's going to take that, and he's
going to hold it in strict confidence.

Now, according to the defense, the only
thing he's not allowed to do with it is
disclose it.  What does that even mean -- to
disclose the drug?

What's Regado worried about?  Regado's
worried about you have our confidential
information.  You have our drug.  Right?
It's the crown jewels.  REG1 -- if it works,
great; Regado goes sky high.  If it fails,
you'll see -- you saw what happens when it
fails.

They want to maintain the
confidentiality of their stuff.  Their stuff
is the drug.  Their stuff is the study

1          results.  Their stuff is the protocol up

2          until the study starts going.

3               So what they say is you have to maintain

4          this in strict confidence.  That means keep

5          it in the vault.  And in the CSRA it says

6          here's when you can take it out of the vault.

7               Ladies and gentlemen, you can read it

8          for yourself.  Nowhere in there does it say

9          go ahead and take our stuff out of the vault

10         and use it to make yourself some money.

11         Nowhere in there does it say go ahead,

12         Dr. Kosinski, and insider trade on our

13         information.

14              It wouldn't make any sense for Regado to

15         permit Dr. Kosinski to be using their stuff

16         for his own benefit, and this is what

17         AUSA Cherry addressed when she was talking

18         about the context of the two agreements.

19              When you apply for a job, if you have to

20         sign a nondisclosure agreement like the

21         CDA -- right?  That's Government's Exhibit 1.

22         I'm not going to put it up -- that says

23         you're not going to disclose the information

24         in this job interview and you're not going to

25         use it and then you actually get the job, the

1    agreement you sign at that point is not going

2    to say, oh, go ahead.  Don't disclose it but

3    use it anyway you want.

4         According to the defense, Dr. Kosinski

5    could have started a rival drug company using

6    the REG1 that he had in his lab and the study

7    results that he was learning as a principal

8    investigator.  That makes no sense, ladies

9    and gentlemen.

10        No one says you have to leave your

11   common sense behind when you become a juror.

12   You have to obey the law as the judge gives

13   it to you, and you have to follow the

14   evidence where it leads you, but you don't

15   have to reach an absurd result.  You don't

16   have to read this contract to make no sense.

17        The defense also argues that the

18   information that Dr. Kosinski got was

19   actually not nonpublic; right?  That's a

20   lawyer way of saying the information

21   Dr. Kosinski got was public.  Everyone knew

22   it or close enough.  So it doesn't -- it

23   doesn't satisfy the element of the law -- or,

24   rather, the element of the offense.

25        Okay.  So let's take a step back here.

1          Mr. Buthusiem, who the defense hired,

2     Dr. Kosinski hired, said the information in

3     Government's Exhibit 10 -- I'm sorry.  Let me

4     blow it up.  Right?  You recognize it by now.

5     This is the June 29th email.  He said this is

6     nonpublic clinical information.  I think I

7     may have asked him some questions using the

8     phrase "nonpublic study information."  And he

9     said, yeah, that's nonpublic study

10     information.

11          Think about how frustrating that must

12     be.  Huh?  Give this guy all that money.  He

13     takes the stand, and he testifies under oath,

14     and he says this is nonpublic.  And then your

15     other lawyer's got to get up and disagree

16     with him.

17          But even if Mr. Buthusiem hadn't made it

18     to court the last -- two weeks ago, just look

19     at who gets this.  Those bcc's -- there are a

20     bunch of them, but those are all the

21     principal investigators.  Those are all

22     people who signed confidentiality agreements

23     like the CSRA.  These are all people who are

24     bound by confidentiality.

25          That's why Dr. Zelenkofske said he

wasn't worried about disclosing this

information to them. Why would he worry?

Like Dr. Kosinski, they all took an oath to

Regado to keep their stuff secret, to

maintain it in strict confidence, to stick it

in the vault and only take it out for the

reasons listed in the CSRA.

So I think what Dr. Zelenkofske said --

it was like the furthest thing from his mind.

Now, your recollection of testimony will

control, but it was something along those

lines in sum and substance. It never even

crossed his mind.

And he even went on to say one of the

reasons it never crossed his mind is because,

when you're a principal investigator in a

study, you don't trade the stock of the

company. Seems like an easy rule to follow.

Makes a lot of sense. It's not the rule that

Dr. Kosinski followed.

So the defense also says, well, you

know, allergies are no big deal -- right? --

because Phase 2b -- remember the earlier

results? Those were public. Those have been

published. And they talked about allergic

reactions in the Phase 2b publications.
Sometimes it gets called the RADAR thing.
So, therefore, everyone knew that maybe
allergic reactions was a possibility I
suppose is the conclusion they want you to
draw.

Ladies and gentlemen, that's the
Government's point.  Everyone in the market
who's investing in Regado stock -- they know
allergies are a big, big deal; right?
Dr. Zelenkofske said that.  Allergies -- big
deal.  Even the expert said that.  Yeah, I
think -- I may have gone -- I may have said,
"big, big deal" -- said it twice.  He agreed
allergies are a big deal.

What Dr. Kosinski knows before everyone
else isn't that allergies are a big deal.
Everyone in the world knows that.  He knows
as of June 29th at 4:00 p.m. there have been
more allergies; right?  The other shoe has
dropped.  This is what everyone is worried
about.  This is what Dr. Zelenkofske called
bad news for Regado.

The Government doesn't have the burden
of proving that the drug trial was going to

fall apart or that REG1 wouldn't be approved. That's not the point here. Dr. Zelenkofske [sic] was playing the market. The point here and what the Government has to show is that he knew this was bad news for Regado and saw an opportunity to make himself some money. And that's what he did.

Everyone knew to be on the lookout for allergic reactions. Dr. Zelenkofske [sic] knows three days before anyone else there have been allergic reactions. So the defense argues, well, okay. This information isn't material because what gets -- this information that he learns on June 29th isn't material because what gets announced a couple days later is different.

Well, it's true Mr. Buthusiem, the expert, paid a lot of money for, said one way to do things is you announce and disclose to your principal investigators at the same time when the market's closed so everyone kind of has the same information simultaneously. And the defense showed you there's a bunch of occasions where that's what happened. That's what Regado chose to do. But the expert also

said that's a way you can do it, not
necessarily the way it must be done.

Now, the defense wants you to reason
backwards; right?  It didn't get disclosed
simultaneously, and so, therefore, it
couldn't have been important.  The
Government -- we just want you to look at
what the evidence is.  Okay?

So just remember Dr. Zelenkofske.  He
says, yeah, no, that's bad news.  It's bad
news there have been more allergic reactions
and that we're going to have to pause the
study.  That's June 29th.

Dr. Zelenkofske said this is important
information for the REGULATE-PCI trial, and
if it's important for REGULATE-PCI, then it's
really important for Regado the company, and
from Dr. Kosinski's perspective, the thing
that he's looking at, it's really important
to Regado's stock price.  That's what this is
about.  That's what he's looking at.  He's
not thinking about the drug or the trial
results or even the patients.  He's thinking
what's this going to do to the stock price?

He figured, he bet that what it would

was drive the stock price down.  And so he
gets this on Sunday at 4:00 o'clock; right?
No dispute.  Market's not open.  Can't really
do much with it then.

So the next morning -- I think it was
like eight minutes or ten minutes before the
market opened.  It was like 9:20, 9:22,
something in that time range.  You heard this
from Mr. Scoufis.  We went through the
trading records -- Dr. Kosinski says I'm out;
right?  Dump it all, all 40,000 shares.  I
want out of this stock entirely.  He thought
this information was important enough, was
material enough to betray his oath to Regado
to maintain their information in strict
confidence.

So how do you know it's material?  I
mean just take him at his word.  It was
important enough to break his word for.
That's pretty important.

And you know what?  He was right.  I
mean he was right.  When the market finds out
there have been allergic reactions and
they're pausing the study, it drops
58 percent.

So and the same thing happens in
Count 2; right?  There's just more of a time
lag.  He learns on July 29th; right?  He gets
that SUSAR.  It says "anaphylactic reaction
resulting in death."  I mean someone died
because of an allergy when you break that
down; right?  We had a bunch of medical
people, and they explained that.  It just
means someone died because they had an
allergic reaction.

He gets that, and he says, whoa; right?
Bad for Regado.  That's what Dr. Zelenkofske
said.  This is more bad news for Regado.

But the problem is Dr. Kosinski -- he's
already out; right?  As of June 30th, he's
out of the stock.  So what's he to do?  Oh,
gosh.  I have this nugget of confidential
information, and I really want to use it, but
I don't have any more stock to sell.  Well,
he figures out what to do.  He makes another
bet against Regado, breaks his oath again,
and he buys puts.

Now, we showed you he tried to buy a
bunch of puts; right?  And the reason that's
important -- I mean the defense asks where's

the evidence the defendant intended to
defraud anyone?  Where's the evidence that he
knew he was doing something bad?

I guess from Dr. Kosinski's perspective,
in for a penny in for a pound.  I've got this
nugget of confidential information I want to
make money on.  He doesn't just dip his toe
in; right?  Dives in headfirst.  He tries to
buy a bunch of puts, but he just can't get it
done, can't find anyone to take his bet.  He
can only buy 50.  But there's other times he
tried to buy puts and couldn't.  He tried to
bet against Regado and couldn't.  That's
evidence of what's going on in his head,
ladies and gentlemen.

We don't -- I mean we don't have a
polygraph hooked up to him that day.  We
don't know -- there's no way of looking
inside his head.  You can infer it from what
he did, and what he did was he tried to push
all his chips in and bet against Regado.  He
just couldn't find anyone to do it all;
right?  So he did what he could.  That's why
he only makes -- what is it? -- 33-, $3500.
He wanted to make a lot more.  He just

1          couldn't get anyone to take the other half of
2          that bet.
3                 So what else is the evidence of what the
4          defendant did was -- when he acted he was
5          intending to defraud someone?  I mean let's
6          be more specific.  He was intending to
7          defraud Regado.  Well, the evidence is he
8          broke his oath to Regado.
9                 The defense points out, well, you know,
10         we said that there's a -- this drop here;
11         right?
12                Count 1 -- that's $160,000 drop.  That's
13         what we say.  If he hadn't sold, he would
14         have lost $160,000.
15                And they say, no, no, no.  His gain was
16         only 18,000.
17                Okay.  So my mistake.  I thought his
18         word was worth $160,000.  He was willing to
19         betray Regado's trust for $160,000.  It turns
20         out he's willing to do it for 17,700 and
21         change.
22                So where else is the evidence for
23         Dr. Kosinski's acts he's intending to defraud
24         Regado?  How about the fact he's hiding what
25         he's doing?  That betrays a guilty mind,

ladies and gentlemen.  That betrays knowledge
of wrongfulness.

And we went through these two examples;
right?  There's Government's Exhibit 69.  He
lies to St. Vincent's.  And it's not like he
could have forgot.  According to the defense,
this is Maria Capasso's fault; right?  They
didn't call her to the stand.  We don't know
what she would say.  But he's the president
of CCR.  He's a cardiologist.  He's the one
who signs this form.  But it's his
secretary's fault?  He traded within a week.
He bought -- I think it was 4,000 shares of
Regado.

So on the 8th and 9th, he buys 4,000
shares.  He couldn't have forgot.  He signs
the thing on the 16th.  And I'm giving him
credit.  I'm not hitting him with what
happens on the 16th because I don't know what
time of day he signed the disclosure form to
St. Vincent's.  But even under the best case
scenario, he signs the form on the 16th, and
he goes out, and he buys another 2,000 shares
that same day.

So the defense might -- Attorney Spears

might tell you Maria Capasso filled it out.
There's no evidence of that.  But what we
know is Dr. Kosinski is the one who signed it
on the 16th when it was a lie.  He lied to
St. Vincent's, and he lied to their IRB.
Remember?  Mr. Buthusiem explained the
importance of the IRB.  They're the ones who
look out for Dr. Kosinski's patients.
Patient safety is paramount, Mr. Buthusiem
said.  Everyone agrees.

Ask yourself is that what Dr. Kosinski's
thinking about when he's lying to
St. Vincent's IRB?  About the fact that he
already owns 4,000 shares?  And remember he
signs the CDA in June of 2017 [sic].  He
starts buying in October.  He starts lying to
St. Vincent's about it a week later.  He
signs the CSRA in January of 2014, and then
he crosses that $50,000 threshold for owning
Regado stock a month later in February.

And that's the second lie he tells.  Now
the defense wants to quibble as to whether or
not he's lying or just not telling Regado
about it promptly.  The fact is he's
concealing from Regado what he had done.

1    He's concealing that he owns more than

2    $50,000 of their stock.  Why?  Why would he

3    do that?

4        I mean it says on the form he'll update

5    it promptly.  It says in the protocol he

6    should update it promptly.  Right in the CFR

7    provision -- remember that regulation, sort

8    of longish and kind of boring?  I went

9    through it with Mr. Buthusiem?  It says he

10   has to update it promptly.  These aren't

11   like -- these aren't rules that are specific

12   to Regado.  That's just the law.  The

13   protocol -- right? -- that's the thing that

14   everyone got.  You're supposed to review it.

15   The disclosure form -- it's the one he filled

16   out in October.  It says on it update it

17   promptly, update promptly if anything

18   changes.  But he keeps it a secret for seven

19   months.

20       And remember since February that he

21   crosses the threshold, and by June he owns

22   $272,000 worth of their stock roughly, and he

23   keeps that a secret too.  All this

24   concealing, all this lying -- that is

25   evidence of what's in Dr. Kosinski 's mind,

1          and from that you can infer that he knew he

2          was doing something wrong.

3               Now, briefly, the defense showed you

4          these timelines; right?  As I understand it,

5          the point of this is there's a lot of stuff

6          going on behind the scenes that Dr. Kosinski

7          doesn't know about.  Yeah.  That's true;

8          right?  In fact, this is a whole chart;

9          right?  There's three pages of it.  There's

10         three charts.  These are all things

11         Dr. Kosinski doesn't really know about.

12              Here's what they're missing, though.

13         It's kind of the most important thing in the

14         whole case, and it's just not there; right?

15         Right here, that red arrow that I put in?

16         That's June 20th.  That's when he sells all

17         his shares in Regado.

18              And then over here, this other red

19         arrow -- that's the 58 percent drop.

20              How about this one?  This actually --

21         they skipped the month of July.  It's kind of

22         an important month here; right?  That's when

23         Dr. Kosinski's buying the puts.  So I don't

24         even know where to put the arrow.  I guess

25         I'd put it like over here.  That doesn't even

1           show up if I do that.  That's July 29th.

2           Most important things in the case, and

3           they're not on their chart; right?  That's

4           when he's buying puts.

5               How about this over here?  That's the

6           60 percent drop in stock price.

7               Or how about over here?  That's

8           August 28th.  That's when he exercises his

9           puts, closes out his position, makes his

10          3,300, $3,500.

11              So who are the people who are privy to

12          all this information?  It's Zelenkofske,

13          DSMB, the leadership of the trial.  I think

14          that's what Mr. Buthusiem called those

15          people.

16              Those leadership -- right? -- they had

17          different contracts.  They had way more

18          restrictions.  Makes a lot of sense.  They

19          know everything; right?

20              DSMB -- they know everything about the

21          trial.  They're unblinded.  They get all the

22          study results.  They're aggregating them.  So

23          they know everything.  Makes sense they would

24          have a lot more restrictions.

25              So but there's no evidence that

1        Dr. Kosinski even knew that the DSMB had a

2        different kind of contract than him, had

3        different confidentiality provisions, or that

4        C5 had different confidentiality provisions

5        or that Duke had different confidentiality

6        provisions or that master service agreement

7        may have a different set of confidentiality

8        provisions.

9            Dr. Kosinski -- there's no evidence that

10        he even saw those.  You know, there's not

11        even any evidence that Dr. Kosinski went back

12        and looked at his own contract in June of

13        2014 when he knows, oh, I've got this secret

14        information; right?  I've got this material

15        nonpublic information.  Am I allowed to trade

16        on this?

17            There's no evidence that he even thought

18        about his contract, his CSRA; went back at

19        looked at it; parsed out the language; and

20        said oh, well, maybe it's a disclosure

21        restriction but not a non-use restriction.

22        No evidence of that whatsoever.  I think your

23        common sense tells you that's very unlikely.

24            And, you know, leadership -- they knew a

25        lot more stuff, and they had a lot more

1    restrictions, and the defendant -- he's not

2    one of them; right?  Dr. Kosinski -- he's not

3    one of the people in the leadership, and it's

4    a good thing; right?  Look at what happens

5    with the two times, two occasions, he knows

6    something; right?  He's got his little nugget

7    of information.  What does he do with it?  He

8    betrays his oath to Regado, and he figures

9    out a way to help himself.

10    One time he avoids $160,000 loss.  The

11    other time he tries to make himself some

12    money.  He only made $3,500, but it's not

13    from lack of trying.  Imagine what would have

14    happened if he had known more.  You don't

15    need to speculate, though.  What matters here

16    is that Dr. Kosinski had what he had, those

17    two pieces of information, and he did what he

18    did; right?  Betrayed his oath to Regado and

19    make -- to profit himself.

20    So the defense wants you to ignore what

21    Dr. Kosinski said to Special Agent McGoey.

22    So he says -- they say, oh, no, it's not --

23    well, they kind of say two things; right?

24    They say it didn't happen because you can't

25    trust Special Agent McGoey.  Or it

1  happened -- that's what he said -- but you

2  shouldn't take it seriously because it's not

3  actually what it looks like.  He's not

4  confessing.  I think he said second -- he was

5  second-guessing himself.  I don't know what

6  that means.

7  The words he said were "I did not feel

8  good about the trades when I made them" and

9  "This was caused by greed and stupidity" or

10  words to that effect.  That is a confession

11  of what was in his mind unless you believe

12  that he's lying to the FBI and that he

13  confessed to them for some reason.  I don't

14  know why.  The defense doesn't supply a

15  reason why he would lie to the FBI and make

16  himself sound guiltier than he is.

17  So, ladies and gentlemen, the last thing

18  I want to say about intent -- the defense

19  points out that no one reminded Dr. Kosinski

20  not to insider trade.  No one told him, hey,

21  you shouldn't be doing this; right?  It's not

22  in any emails.  They didn't stamp them

23  "Confidential."

24  In Miami when they had them all

25  together, when they were giving them

1    breakfast, lunch, and dinner -- remember he

2    signed in and circled "Yes" for breakfast and

3    stuff -- they didn't say, hey, by the way,

4    when you're out there, kids, be careful.

5    Don't insider trade on the material nonpublic

6    information we're going to be giving you.

7         But, you know, insider trading -- it's

8    not a rule that Regado came up with.  It's

9    not a Regado-specific thing.  That's just the

10   law.  It's not something that's special to

11   Regado or C5 or Duke or St. Vincent's or CCR,

12   and it's not any of their job to stop

13   Dr. Kosinski from violating the law.  It's

14   not anyone's responsibility other than

15   Dr. Kosinski's.

16        Ladies and gentlemen, I'm going to ask

17   you to apply the evidence to the laws as the

18   judge gives it to you and return your

19   verdict -- there's only one just verdict here

20   that you can return, and that's guilty on

21   both counts.

22        Thank you very much for your time and

23   attention.

24        Nothing further, your Honor.

25        THE COURT:  All right.  Ladies and

1       gentlemen, your lunch should be here, and I'm

2       going to give you an hour break to eat your

3       lunch.  After that, I will charge you on the

4       law and excuse you to deliberate.  In the

5       interim, we will confirming that all the

6       exhibits have been uploaded so that you will

7       have them with you in the jury room.

8            So enjoy your lunch and remember to

9       abide by your oath until I authorize you to

10      deliberate.

11

12           (Luncheon recess:  12:13 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

                        AFTERNOON SESSION

                          1:22 p.m.


          THE COURT:  All righty.  Please bring in
the jury.

          MR. SPEARS:  If your Honor please?

          THE COURT:  Yes.

          MR. SPEARS:  I just wanted to raise two
quick points --

          THE COURT:  Yes.

          MR. SPEARS:  -- in regards to the jury
instructions.

          THE COURT:  Yes.

          MR. SPEARS:  We've received the copies
that your chambers has provided.

          THE COURT:  Yes.

          MR. SPEARS:  And I just want to mention
two things.  One is I think the parties had
agreed that, with respect to Section 26 on
"admissions of the defendant" --

          THE COURT:  Yes.

          MR. SPEARS:  -- that the language could
be changed to "statements of the defendant."
The parties had agreed that that change could
be made (indiscernible crosstalk).

1          THE COURT:  Is the Government in

2     agreement?

3          MS. CHERRY:  Yes, the Government agreed

4     when we had that conference call last week.

5          THE COURT:  All righty.

6          MR. SPEARS:  I appreciate that.

7          And then the second point, your Honor,

8     is really just a procedural point.  As your

9     Honor is aware, we have submitted some

10    requests to the charge that your Honor is not

11    using, and we've noted our objections to

12    that.  I think, technically, under Rule 30 of

13    the Federal Rules of Civil Procedure, I need

14    to renew my objection after the charge is

15    given.

16         THE COURT:  Yes.

17         MR. SPEARS:  And I just wasn't sure what

18    your Honor's practice was for affording us an

19    opportunity to do that.  Of course we would

20    prefer not to do it in the presence of the

21    jury.  And I can do it quickly.

22         THE COURT:  You can do that now, or you

23    can do that after I excuse them.

24         You have read in the charge that I tell

25    them that I will confer with the attorneys

 1         after I deliver the charge and, if

 2         appropriate, I'll give them supplemental

 3         instructions.  So that would be the normal

 4         point in time where you would object to the

 5         charge -- after it's actually delivered.

 6              MR. SPEARS:  Yes, your Honor.  So we'll

 7         go ahead and do it that way.

 8              THE COURT:  Is that fine?

 9              MR. SPEARS:  Yes, it is.  Thank you.

10              THE COURT:  All righty.  Good.

11         Okay.  We're ready.

12         (Pause.)

13              THE COURT:  One second.  One second,

14         Jeremy.

15              So we need to change that page, don't

16         we?

17              MR. SPEARS:  Yes.  It is --

18              THE COURT:  We do.

19              MR. SPEARS:  It's in the table --

20              THE COURT:  We need to change that page.

21              MR. SPEARS:  Yes.

22              THE COURT:  It's in the table of

23         contents, the heading.

24              All right.  So let's pull the jury

25         charges and make that change.

        1              MR. SPEARS:  Thank you, your Honor.

        2              THE COURT:  You're welcome.

        3              MR. SPEARS:  It's both in the table of

        4       contents and the instruction.

        5              THE COURT:  Yes.

        6

        7              (Recess:  1:25 to 1:45 p.m.)

        8

        9              (Jury panel entered the courtroom.)

       10

       11              THE COURT:  Would counsel please

       12       stipulate to the presence of the jury?

       13              MS. CHERRY:  Yes, your Honor.

       14              MR. SPEARS:  Yes, your Honor.

       15              THE COURT:  Thank you.

       16              Please be seated.

       17              Members of the jury, you have heard all

       18       of the evidence in the case and the closing

       19       arguments of counsel, and it is now time for

       20       me to instruct you on the law which applies

       21       in this case in which you must use in

       22       deciding this case.

       23              After I instruct you on the law which

       24       you must apply, I will give you additional

       25       instructions concerning the deliberation

1    phase of the trial, and then you will return
2    to the jury room to deliberate in accordance
3    with my instructions.
4    Before I give you these instructions,
5    however, I want to express my thanks and
6    those of the United States and Dr. Kosinski
7    for the time and attention you have devoted
8    to this trial.  Jury service is rarely
9    convenient, but without the presence and
10   commitment of civic-minded citizens like
11   yourself, justice could not be done in this
12   or in any other case.
13   It will take some time for me to deliver
14   these instructions to you, but it is
15   important that you listen carefully and pay
16   close attention.
17   My instructions will be delivered in
18   four phases:
19   First, some instructions on the general
20   rules that define and control the role of the
21   Court and the duty of a jury in a criminal
22   case;
23   Second, some general instructions about
24   the indictment;
25   Third, specific instructions that define

the elements of the offenses charged in the

indictment.  That means each of the elements

must have proven beyond a reasonable doubt in

order to prove the defendant guilty of each

count;

And, fourth and finally, some rules and

guidelines for your deliberations.

After I conclude my instructions, I'll

confer with the parties, and if appropriate,

I may give you supplemental instructions.

I would ask you now to take a moment to

review the documents each of you found at

your seats.  You will see that you have a

verdict form and a set of jury instructions.

When I conclude these instructions and

you're excused to deliberate, you will hand

the copies you're now reviewing to

Mr. Shafer.

In the deliberation room, you will have

the -- one original verdict form and the jury

instructions and the exhibits.  The jury

instructions and the exhibits will be

uploaded.  They're available to you

electronically.

For the moment, your brief review of the

1    verdict form and the table of contents of the

2    jury instructions will better enable you to

3    understand my instructions.  So just take a

4    moment, please, and do that.

5         (Pause.)

6         THE COURT:  Ladies and gentlemen, I

7    trust that your brief review and my

8    instructions will enable you to understand

9    better my instructions and the tasks that

10   you'll be asked to perform when you

11   deliberate.

12        As I deliver my instructions, you may

13   read along if you wish; however, please be

14   mindful that you will not have a copy of the

15   jury instructions you're now holding with you

16   in the jury room when you deliberate.  So if

17   you want to take notes, please use your

18   notebooks.

19        This, as are most, is a long jury

20   instruction, and I will repeat certain parts

21   to make my instructions clear but not because

22   repeated instructions are more important.

23   You should not single out any one part of my

24   instructions and ignore or diminish the

25   importance of any other instruction.  All my

1      instructions are equally important, and you
2      should consider all the instructions as a
3      whole and consider each instruction in light
4      of all of the evidence.  Similarly, the order
5      in which I give you these instructions does
6      not indicate their relative importance.

7           I should also point out to you that,
8      although you've been given a copy of the
9      instructions and are entitled to follow along
10     as I deliver them, if I say anything
11     different than what is written, you must
12     follow what I say here in court.

13          I would first like to explain my role.
14     As judge, it is my duty to preside over the
15     trial to ensure that it's conducted fairly
16     and in accordance with the law.  In order to
17     do so, I perform two functions during the
18     trial:

19          First, I decide what evidence you can
20     hear, and you've heard me doing that
21     throughout the trial.

22          Second, I instruct you on the law which
23     you must apply to the facts that you find in
24     the case, and that is what I'm doing now.

25          I gave you some preliminary instructions

1    before the trial began, but it is now at the

2    close of evidence that I give you the final

3    instructions that govern your deliberations.

4     Please be patient and listen carefully.

5    I believe that everything I'm going to tell

6    you is consistent with the preliminary

7    instructions I gave you at the start of the

8    trial, but if you have any doubt, you should

9    not rely upon anything different that I may

10   have said in the preliminary instructions.

11   The instructions I'm giving you now must

12   guide your deliberations in this case.

13    It is your duty to take the law as I

14   give it to you and to apply it to the facts

15   as you determine them.  You must take the law

16   as I give it to you even if an attorney, a

17   witness, or an exhibit has stated a legal

18   principle which you understand to be

19   different from any legal principle that I

20   state to you here in my instructions.  It is

21   my instructions that you must follow.  Also,

22   you may not substitute your own notions or

23   opinions of what the law is or ought to be

24   for what I tell you it is in my instructions.

25    Turning now to your role, your role is

1     to determine the facts in the case and to

2     apply the law as I give it to you to the

3     facts that you find to have been proved by

4     the evidence introduced here in the

5     courtroom.

6          The Court has no view on what facts have

7     and have not been proved.  You are the sole

8     triers of fact, and only you determine what

9     facts have been proved.  This is the sole and

10    exclusive province of you the jury, and the

11    Court would never invade your exclusive

12    domain.  It is for you and you alone to

13    decide what facts have and have not been

14    proved.

15         Once again, as I have stated previously,

16    it is your duty to find the facts from all of

17    the evidence in the case, but you must apply

18    the law as I give it to you to the facts as

19    you find them.  You must follow the law as I

20    give it to you whether you agree with it or

21    not.  You must do your duty as jurors

22    regardless of any personal likes or dislikes,

23    opinions, prejudices, or sympathies.  In

24    other words, you must decide this case based

25    solely upon the law which you apply to the

facts you find were proved by the evidence

before you which you must consider

dispassionately and free from emotion.  You

will recall that you took an oath promising

to do so at the beginning of the case.

In your role as jurors, you're not to be

concerned with the wisdom of the policy or

the laws that Mr. Kosinski has been charged

with violating.  If, in fact, a violation has

occurred, the law should be enforced.  Your

only responsibility is to determine whether

the Government has proved beyond a reasonable

doubt that Dr. Kosinski has violated the law

as charged.

In order for the Court to enter a

verdict, it must be unanimous.  That means

that each of you must agree with the verdict

announced by the foreperson in the courtroom.

When the foreperson announces the verdict,

you will be polled, meaning each of you will

be asked to stand when your name is called

and state whether you agree with the verdict

announced by the foreperson.  You must each

decide the case for yourself, but you must do

so after fair and impartial consideration of

1       all of the evidence in the case and fair

2       consideration of, the observations of, and

3       your conversations with your fellow jurors.

4       Each of you has a duty to deliberate, which I

5       will explain in further detail later.

6               Regardless of your ultimate decision

7       about this case, all of the parties in this

8       case are entitled to a full and fair hearing.

9       The parties are entitled to a trial that is

10      free from prejudice and bias.  It is wholly

11      improper for you to consider any personal

12      feelings that you may have about

13      Dr. Kosinski's race, religion, national

14      origin, or gender in reaching your decision.

15      It would be equally improper for you to allow

16      any personal feelings you may have about the

17      nature of the crimes charged to interfere

18      with the fairness and impartiality of your

19      decision-making process.  You must not be

20      swayed by either sympathy for or prejudice

21      against any party.  If you allow sympathy or

22      prejudice to interfere with your clear

23      thinking, there is a serious risk that you

24      will not reach ape just verdict.

25              It is your duty, therefore, to give

careful thought to each issue set forth by
the instructions regardless of any general
feelings that you may have about which party
is right.  You must decide this case by
deciding which facts have been proved and
applying the law as I give it to you to these
facts.

As you know, Dr. Kosinski didn't
testify.  Under our Constitution, a defendant
has no obligation to testify or present any
evidence in their defense because it is the
Government's burden to prove him guilty
beyond a reasonable doubt.  That burden
remains with the Government throughout the
entire trial and never shifts to
Dr. Kosinski.  A defendant is never required
to prove that he is innocent.  He is presumed
to be innocent.

It bears repeating that you may attach
no significance whatsoever to the fact that
Dr. Kosinski didn't testify.  There are many
complex reasons why a defendant may choose
not to testify including strategic decisions
made by the defendant's attorney.  You're not
to speculate as to why Dr. Kosinski didn't

1    testify or about what he might have said had

2    he elected to testify.  You may not draw any

3    adverse inference because he didn't take the

4    witness stand and testify.  You may not

5    consider this against Dr. Kosinski in any way

6    in your deliberations.  You are to confine

7    your deliberations exclusively to the

8    question of whether or not on the evidence

9    actually before you the Government has

10   established Dr. Kosinski's guilt beyond a

11   reasonable doubt.

12        There are three basic principles of

13   criminal trials, and they are the presumption

14   of innocence, the burden of proof, and proof

15   beyond a reasonable doubt, and I'm going to

16   instruct you on each of those principles.

17        First, as you know, under our system of

18   justice, each individual charged with the

19   commission of a criminal offense is presumed

20   to be innocent.  I instruct you that you must

21   presume Dr. Kosinski innocent of the charged

22   offenses.  Thus although he's accused of

23   crimes, he began the trial with a clean

24   slate -- that is, with no evidence against

25   him -- and, therefore, he's presumed to be

innocent.

An indictment, as you already know, is not evidence of any kind. The law permits nothing but legal evidence to be before the jury in court to be considered in support of any charge against Dr. Kosinski. The presumption of innocence, therefore, is sufficient to acquit Dr. Kosinski.

The presumption of innocence was with Dr. Kosinski when the trial began, and it remains with him even now as I speak to you.

I also instruct you that the defendant shall be presumed by you to be innocent throughout your deliberations until such time, if ever, as you the jury are satisfied after careful consideration of all of the evidence in the case and the law given to you in these instructions that the Government has borne its burden of proving Dr. Kosinski guilty beyond a reasonable doubt. This brings me to the second principle of the burden of proof.

An individual accused of a crime has a right against self-incrimination and thus a right to remain silent. Since a defendant is

presumed to be innocent and has no obligation
to say anything concerning the charges
against him, it naturally follows that under
our system of justice the Government bears
the burden of proof.  That means the
Government must prove that Dr. Kosinski
committed each of the elements of a
particular crime charged in order for you to
find him guilty of that crime.  The burden
never shifts to Dr. Kosinski.  Dr. Kosinski
has no duty whatsoever to introduce any
evidence.  That means he doesn't have to call
or cross-examine a single witness or
introduce a single exhibit.

However, he has no duty -- excuse me.
Not "however" but -- moreover, he has no duty
to testify, and you may not presume him
guilty because he elects to exercise his
constitutional right to remain silent and
hold the Government to its burden of proving
him guilty.

The Government must prove Dr. Kosinski
guilty beyond a reasonable doubt in order for
him to be found guilty.  The Government must
prove that he committed each element of each

```
1          crime charged beyond a reasonable doubt in
2          order for a jury to convict a defendant of
3          that crime.
4               The term "reasonable doubt," ladies and
5          gentlemen, defines itself.  A reasonable
6          doubt is a doubt based upon reason and common
7          sense.  It is a doubt that a reasonable
8          person has after carefully weighing all of
9          the evidence.  Proof beyond a reasonable
10         doubt must be proof of such a convincing
11         character that a reasonable person would not
12         hesitate to rely upon it in the most
13         important of his or her own affairs.
14              On the other hand, a reasonable doubt is
15         not a caprice or whim.  It's not a
16         speculation or a suspicion.  It is not an
17         excuse to avoid the performance of an
18         unpleasant duty.  Reasonable doubt is not
19         sympathy, and it is not prejudice.
20              Although the Government must prove guilt
21         beyond a reasonable doubt, the Government is
22         not required to prove guilt beyond all
23         possible doubt.  The test, ladies and
24         gentlemen, is reasonable doubt.
25              Reasonable doubt can be based upon
```

1    evidence or the absence of evidence.  You may

2    find that the record before you consists of

3    evidence and the lack of evidence on a

4    particular matter.  An absence of evidence

5    may provide the reasonable doubt upon which

6    the jury decides not to find a defendant

7    guilty.

8         After your fair and impartial

9    consideration of all of the evidence and the

10    lack of evidence against Dr. Kosinski on a

11    particular charge, if you have a reasonable

12    doubt, it is your duty to acquit the

13    defendant of that charge.  That is, it is

14    your duty to find the defendant whom the

15    Government has not proven guilty beyond a

16    reasonable doubt not guilty.

17         On the other hand, if, after fair and

18    impartial consideration of all of the

19    evidence against the defendant, you are

20    satisfied beyond a reasonable doubt that the

21    defendant committed each of the elements

22    constituting the charge you are considering,

23    you must find the defendant guilty.

24         If you view the evidence relating to a

25    particular charged offense as reasonably

1    permitting either one of two conclusions, one

2    being innocence and the other guilt, you have

3    reasonable doubt, and you must not find the

4    defendant guilty of that charge.

5         Now, what do I mean when I say "prove,"

6    "find," and "establish"?  Throughout the

7    remainder of my instructions, I will use

8    these terms.

9         The term "prove" when I'm talking about

10   what the Government must prove in order to

11   establish Dr. Kosinski's guilt -- my word --

12   use of the word "prove" means proof beyond a

13   reasonable doubt even if I do not always

14   repeat the words "beyond a reasonable doubt"

15   each and every time.

16        Similarly, when I say -- talk to you

17   about "finding" a fact, you must find those

18   facts to have been proved by the Government

19   beyond a reasonable doubt even if I don't say

20   "beyond a reasonable doubt" and I simply say

21   "find."

22        Likewise, if I say the Government must

23   "establish" a fact, you must find that fact

24   to have been established by the Government

25   beyond a reasonable doubt.

1           As you know, a juror must be fair and
2      impartial.  This case is important to the
3      Government for the enforcement of criminal
4      law as a matter of primary concern to the
5      community at large, but it is equally
6      important to Dr. Kosinski, who is charged
7      with serious crimes.  The Government and
8      Dr. Kosinski want your full, fair, and
9      impartial consideration of all of the
10     evidence presented and their application --
11     your application of those facts to the law as
12     I give it to you, nothing more and nothing
13     less.
14          This is what our system demands, and
15     each of you said that you could do this, and
16     we are certain that you will faithfully
17     discharge your duty.
18          Now, the fact that the prosecution is
19     brought in the name of the United States
20     entitles the Government to no greater
21     consideration than that accorded to any other
22     party to the litigation.  By the same token,
23     it's entitled to no less consideration.  Both
24     of the parties, whether the Government or
25     Dr. Kosinski, stand equal before the law and

are to be dealt with as equals in a court of

justice.  The question before you can never

be will the Government win or lose this case

because the Government always wins when

justice is done, regardless of the verdict.

The Government always wins when justice is

done, regardless of the verdict.

You must be guided solely by a

dispassionate consideration of the evidence

presented during the trial and the law that I

give you without regard to the consequences

of your verdict.  You have been chosen to try

the issues of fact and reach an impartial

verdict on the basis of the evidence or the

lack of evidence.  I know that you will do

this and in that way reach a just and true

verdict.

Now, it bears stressing that our justice

system cannot work unless you reach a verdict

through a fair and impartial consideration of

all of the evidence, regardless of the final

outcome of the case.

Ladies and gentlemen, this, like all

trials, was conducted in accordance with the

Rules of Evidence.  The Rules of Evidence are

1        complex principles about which lawyers and

2        even judges disagree.  Over the course of the

3        trial, I've been called upon to make rulings

4        on what evidence should be admitted and what

5        evidence should not be admitted and for what

6        purpose.

7            There have been occasions when one or

8        more of the attorneys have asked to confer

9        with the Court outside of your hearing.  In

10       such situations, you the jury should not feel

11       slighted.  You're not to speculate about what

12       may have been discussed.  Likewise, you

13       should have no resentment toward any attorney

14       who requested a sidebar conference or who

15       made a statement or asked a question that

16       prompted a sidebar conference.

17           In the interest of justice and to

18       expedite the trial, it is perfectly proper

19       that conferences be held right here at the

20       bench between counsel and the Court to avoid

21       the inconvenience of having the jury file out

22       of the court and back in and because it

23       prevents the jury from becoming confused or

24       tainted by technical legal issues.

25           Our courts operate on an adversarial

```
1         system where we believe the truth will emerge

2         through the competing presentations of

3         adverse parties.  It is the role of the

4         parties to press as hard as they can for

5         their respective positions.  In fulfilling

6         that role, they have not only the right but

7         indeed the obligation to raise the legal

8         issues for the Court to consider by making

9         objections to the proposed admission of

10        evidence when a party believes it to be

11        improper.  You should not show any prejudice

12        against a party because a party objected to

13        the admission of evidence, objected to the

14        phrasing of a question, or asked the Court to

15        rule on an objection or the phrasing of a

16        question.

17             As I said earlier, the Rules of Evidence

18        are complex principles, and they're not

19        always clear, and disagreements about what is

20        and what is not permissible is perfectly

21        normal.  This is one of the reasons, as I

22        stated earlier, a judge presides over a

23        trial:  to resolve these legal issues and

24        determine what the jury can and cannot hear.

25             It is important for you to realize,
```

however, that my rulings on evidentiary
matters have nothing to do with the ultimate
merits of the case.  My rulings are not to be
considered as points scored for one side or
the other.  You're not to be concerned with
why a party made an objection or why I ruled
as I did.  You should draw no inference from
the fact that a party made an objection to
evidence, nor should you draw any inference
from my rulings.  In addition, you must
decide this case based upon the evidence and
therefore you may not consider what you might
have heard had I made a different ruling.  My
rulings on objections have nothing to do with
the merits of the case or with the
credibility of the witnesses.

Turning now to the personality of the
attorneys, during the course of the trial one
cannot help but recognize the various
personalities and styles of the attorneys.
However, it is important for you as jurors to
recognize that this is not a personality or
style contest.  Your duty is not to decide
the case based upon what you think about the
attorneys' personalities or style.  Whatever

you may think about the conduct of the
attorneys during this case, you must remember
that this is a dispute about the facts and
the law.  Your solemn duty is to decide this
case not on the basis of the style and
personality of the attorneys but solely on
the basis of the evidence and the law.

What do I mean when I say the
"evidence"?

There are two types of evidence in this
case:  first, testimonial evidence and,
second, physical evidence.

By testimonial evidence, I mean the
testimony of the witnesses who came into
court, swore an oath to tell the truth, sat
in that witness stand, and answered the
questions the attorneys asked.

And by physical evidence I mean the
exhibits and tangible evidence introduced
here in the courtroom and admitted by me as
full exhibits.

You will have, as I indicated earlier,
the physical evidence with you in the jury
room.

Now, the parties marked all possible

1      exhibits for identification purposes prior to

2      trial.  Some of those exhibits were

3      duplicates, and some of those were simply not

4      used.  Therefore, the full exhibits you will

5      have with you in the jury room will be out of

6      sequence.  You need not be concerned that

7      you're missing any exhibits.  They've been

8      examined by the attorneys, and they have been

9      confirmed as complete as they will be made

10      available to you in the jury room.  So you

11      can be certain that you have all of the

12      exhibits entered into evidence.

13          Now, everything else you heard in the

14      courtroom is not evidence and may not be

15      considered by you in deciding this case.  The

16      opening statements and closing arguments of

17      counsel are not evidence.  The questions the

18      attorneys asked the witnesses are not

19      evidence.

20          So if an attorney asked a witness,

21      "Isn't it true the sky is blue?" there is no

22      evidence that the sky is blue unless the

23      witness answered the question affirmatively

24      and said "Yes" or something to that effect.

25          The attorneys' objections to the

1   introduction of evidence and their arguments

2   on objections and my rulings on objections

3   are not evidence.

4    Any answer I told you to disregard is

5   not evidence.  Material offered to refresh a

6   witness's recollection or memory is not

7   evidence unless fully admitted as such.

8    Remember, statements and

9   characterizations of the evidence by the

10   attorneys is not evidence.

11    So far as you find their closing

12   arguments helpful, take advantage of them.

13   If their memory of the facts differs from

14   yours, it's your memory that controls and

15   your evaluation of the evidence that controls

16   and my instructions on the law that counts in

17   this case.

18    Anything that you may have heard or seen

19   outside of the courtroom is not evidence.  I

20   remind you that you must completely disregard

21   any media reports on this matter including

22   anything you may have heard or read on the

23   radio, television, the internet, social

24   media, or other information source.  It would

25   be unfair to consider such information since

1       it is not evidence and the parties have no

2       opportunity to challenge its accuracy or

3       otherwise explain it.  In short, it would be

4       a violation of your sworn oath as jurors to

5       allow yourselves to be influenced in any

6       manner by such publicity or other

7       information.

8           In addition, nothing that I have said or

9       done is evidence, and you may not consider my

10      rulings or statements, these instructions, or

11      anything else I may have said or done as

12      evidence or as any indication of how I

13      believe you should find the facts and decide

14      this case.  Again, only the testimony of the

15      witnesses and the exhibits admitted into

16      evidence by me are evidence to be used by you

17      in deciding what facts have been proved.

18          Now, I've told you about the two forms

19      of evidence.  Let me now tell you about the

20      two kinds of evidence:  direct and

21      circumstantial.

22          Direct evidence is direct proof of a

23      fact such as the testimony of an eyewitness.

24      Circumstantial evidence is a fact that you

25      can infer from another fact, even a fact you

1        infer to be true.  Yes, you may also infer a

2        fact to be true based upon a fact that was

3        not proved by direct evidence and instead was

4        proved to your satisfaction by circumstantial

5        evidence.  You are entitled to consider both

6        kinds of evidence, both direct and

7        circumstantial.

8        Now, the word "infer" or the expression

9        "to draw an inference" means to find a fact

10       based upon proof of another fact.

11       For example, if you were to leave the

12       courthouse today and see water on the street,

13       you could infer that it rained while you were

14       here in the courtroom without any window,

15       unable to observe what was going on outside.

16       In other words, the fact of rain on the

17       ground is an inference which you could draw

18       from the circumstantial evidence of the

19       presence of water on the street.  In other

20       words, you could infer that it rained if you

21       walked out of the courtroom and saw water on

22       the street even though you didn't see it

23       actually raining.

24       Direct evidence of rain would be your

25       actual observation of rain drops falling from

the sky.

The law makes no distinction between the weight to be given to direct and circumstantial evidence.  They are equally valid bases upon which to render a verdict.

But please be mindful that an inference is not a suspicion or a guess.  It is a reasoned, logical conclusion that a disputed fact exists on the basis of another fact that you know to have existed or that you know exists.

There are times that inferences can be drawn from facts, and there are times when multiple inferences can be drawn from facts, whether proven by direct or circumstantial evidence.

The Government may ask you to draw one set of inferences while the defense asks you to draw another.  It is for you and you alone to decide what inferences you will draw, if any.

The process of drawing inferences from the fact in evidence is not, however, a matter of guesswork of speculation.  An inference, again, is a deduction, a

1      conclusion which you the juror are -- jury

2      are permitted but not required to reach from

3      the facts that have been established either

4      by direct or circumstantial evidence.  Yes,

5      once again, you may draw inferences from

6      facts that you have inferred to be true.

7           In drawing inferences, you must exercise

8      your common sense.  So while you are

9      considering the evidence presented at trial,

10     you are permitted to draw from the facts that

11     you find to have been proven such reasonable

12     inferences or to make such logical deductions

13     as would be justified in light of your

14     experience.

15          Each juror must be guided by his or her

16     own sets of whether an inference is justified

17     or reasonable under all of the circumstances

18     presented.  Each juror should carefully weigh

19     what inferences, if any, to be drawn from the

20     evidence presented.

21          Here again, let me remind you that,

22     whether from direct or circumstantial

23     evidence or from the logical and reasonable

24     inferences drawn from such evidence, you must

25     be satisfied of the guilt of Dr. Kosinski

1    beyond a reasonable doubt before you can

2    convict him of a charge.

3         Anything that is not reasonably inferred

4    or logically deduced from the direct evidence

5    is not circumstantial evidence and may not be

6    used by you to decide this case.

7         The law does require that you be

8    convinced of the defendant's guilt beyond a

9    reasonable doubt based upon all of the

10   evidence in the case, both direct and

11   circumstantial.

12        As you recall, Dr. Kosinski is presumed

13   to be innocent and therefore does not have to

14   prove his innocence.  Therefore, when the

15   defense relies on circumstantial evidence,

16   you may not hold the defense to proving facts

17   that convince you beyond a reasonable doubt

18   of their existence.  Because the defendant

19   need not prove any fact, if the defendant's

20   evidence on a given fact is in your judgment

21   believable or credible, then you may accept

22   it as proven.

23        As I instructed you earlier, a judge is

24   indifferent as to how you decide the case.

25   My role has been limited to making rulings

 1          and ensuring to the best of my ability a fair

 2          and impartial trial.

 3              To that end, during the course of the

 4          trial I've occasionally asked a question of a

 5          witness in order to clarify or amplify the

 6          testimony to avoid misunderstandings or to

 7          bring out facts not clearly or fully covered

 8          in the testimony.

 9              You will recall that I told you that the

10          questions of counsel and the arguments of

11          counsel are not evidence and may not be

12          considered by you as such.  Similarly, my

13          questions, comments, and rulings are not

14          evidence either.

15              Remember at all times that you should

16          not infer that my questions of any witness,

17          my comments, my rulings, or anything I may

18          have said or done including in these

19          instructions indicate that I have any opinion

20          on how you should decide this case because I

21          do not.

22              You have heard the testimony of

23          government officials.  The fact that a

24          witness may be employed by the federal

25          government as a law enforcement officer or

1    regulatory official does not mean that his or

2    her testimony is necessarily deserving of any

3    more or less consideration or greater or

4    lesser weight than that you would accord an

5    ordinary witness.

6        At the same time, it is quite legitimate

7    for defense counsel to try to attack the

8    credibility of a government official on the

9    grounds that his testimony may be colored by

10   a personal or professional bias or interest

11   in the outcome of the case.  Evidence that a

12   witness is biased or prejudiced or hostile

13   toward Dr. Kosinski requires you to view that

14   witness's testimony with caution, to weigh it

15   with care, and to subject it to close and

16   searching scrutiny.

17       It is your decision, after reviewing all

18   of the evidence, whether to accept the

19   testimony of a law enforcement officer or a

20   regulatory official and to give that

21   testimony whatever weight you believe it

22   deserves, if any.

23       I permitted an expert witness to testify

24   and express his opinion about matters that

25   are in issue.  A witness may be permitted to

testify as to their opinion on those matters

about which he or she has special knowledge,

education, training, or skill.  Such expert

testimony is presented to you on the theory

that someone who is experienced and

knowledgeable in the field can assist you to

understand the evidence or in reaching an

independent decision on the facts.

In weighing the testimony of an expert,

you may consider the witness's

qualifications, his or her opinions, the

reasons for testifying as well as other

considerations that ordinarily apply when you

are deciding whether to believe a witness's

testimony.

In weighing the witness's testimony, you

should also consider any bias, motive, or

interest in the outcome of the case that you

may find such expert may have.  You may give

the opinion testimony whatever weight, if

any, you find it deserves in light of all of

the evidence in the case.

You should not, however, accept expert

testimony merely because I allowed the

witness to testify concerning his opinion,

1   nor should you substitute it for your own

2   judgment and common sense.

3       The determination of the facts in this

4   case rests solely with you, ladies and

5   gentlemen.  As with the testimony of any

6   other witness, you the jury may decide to

7   accept all, some, or none of the testimony of

8   any expert witness.

9       If you decide that an opinion of an

10  expert witness is not based upon sufficient

11  education and experience or if you should

12  conclude that the reasons given in support of

13  the opinion are not convincing to you or you

14  feel that the opinion is outweighed by other

15  evidence, you may disregard the expert's

16  opinion testimony.

17      A word on the number of witnesses and

18  uncontradicted testimony:  The fact that one

19  party called more witnesses than the other or

20  introduced more evidence than the other does

21  not mean that you should find the facts in

22  favor of the side offering the most witnesses

23  or evidence.  You also are not required to

24  accept testimony even though the testimony

25  was uncontradicted and the witness was not

1   impeached.  You may decide based upon the

2   witness's bearing and demeanor or because of

3   the inherent improbability of his testimony

4   or for other reasons sufficient to you that

5   such testimony is not worthy of belief.

6        On the other hand, the testimony of a

7   single witness may be sufficient to convince

8   you beyond a reasonable doubt of the

9   existence of an essential element of the

10  offense charged if you believe that the

11  witness has been truthful and accurate.

12       You have to decide which witnesses to

13  believe and which facts are true, and to do

14  this you must look at all of the evidence,

15  drawing upon reason and common sense and

16  experience.

17       You've been shown charts and summaries,

18  and they were shown to you in order to make

19  other evidence more meaningful and to aid you

20  in considering the evidence.  These charts

21  are no better, however, than the testimony

22  and documents on which they were based and

23  are not in and of themselves independent

24  evidence.  Therefore, you are to give no

25  greater consideration to these schedules or

1       summaries than you would give to the evidence

2       on which they are based.

3               It's for you to decide whether the

4       charts and summaries correctly present the

5       information contained in the testimony and

6       the exhibit on which they are based.  You are

7       entitled to consider the chart, schedules,

8       and summaries if you find if they are of

9       assistance to you in analyzing and

10      understanding the evidence.

11              There has been evidence that

12      Dr. Kosinski made certain statements to a law

13      enforcement agent, and the Government claims

14      these statements were admissions of facts

15      charged in the indictment.

16              In deciding what weight to give to

17      Dr. Kosinski's statements, you must first

18      examine with great care whether each

19      statement was made and whether, in fact, it

20      was voluntarily and understandingly made.  I

21      instruct you that you are to give each

22      statement such weight as you feel it deserves

23      in light of the evidence, if any.

24              Turning now to the evaluation of the

25      evidence, it must be clear to you now that

1          you're being called upon to resolve the

2          factual issues.  You will now have to decide

3          where the truth lies, and an important part

4          of that decision will involve making

5          judgments about the testimony of the

6          witnesses you have listened to and observed.

7               In making these judgments, you should

8          carefully scrutinize all of the testimony of

9          each witness, the circumstances under which

10         each witness testified, and any other matter

11         in evidence that will help you to decide the

12         truth and the importance of each witness's

13         testimony.

14              You've had an opportunity to observe all

15         of the witnesses, and it is now up to you to

16         decide how believable each witness was in his

17         or her testimony and the credibility of the

18         other evidence.  You are the sole judges of

19         the credibility of each witness and the other

20         evidence, and you are the judges of the

21         importance of the evidence.

22              Your decision whether or not to believe

23         a witness may depend upon how that witness

24         impressed you.  Was the witness candid and

25         forthright, or did the witness seem as though

he or she was hiding something, being
evasive, or acting suspect in some way?  How
did the way the witness testified on direct
examination compare to how the witness
testified on direct [sic] examination.  Was
the witness consistent in his or her
testimony, or did the witness contradict him
or herself?  Did the witness appear to know
what he or she was talking about, or was the
witness speculating or guessing?  Did the
witness strike you as someone who was trying
to report accurately and truthfully?

In making that decision, you may
consider the witness's opportunity to observe
the events he or she described, the witness's
intelligence and memory, the witness's
bearing or demeanor while testifying, whether
the witness has any interest in the outcome
of the case, any bias or prejudice concerning
any party or any matter involved in the case.
Does the witness have some incentive,
loyalty, or motive that might cause the
witness to shade the truth or give you
something other than a completely accurate
account of the facts to which the witness

1    testified?

2          In connection with your evaluation of

3    the credibility of the witness, you may

4    consider evidence of resentment or anger that

5    the witness may have toward Dr. Kosinski.

6          Evidence that a witness is biased,

7    prejudiced, or hostile requires you to weigh

8    the witness's testimony with caution, to

9    weigh it with care, and subject it to close

10   and searching scrutiny.

11         Now, this is not to suggest that every

12   witness who has an interest in the outcome of

13   the case will testify falsely, but it is,

14   however, for you to decide to what extent, if

15   at all, the witness's interest has affected

16   or colored his or her testimony.

17         And, finally, you should consider the

18   reasonableness of the witness's testimony in

19   light of all of the evidence in the case.  If

20   you find that a witness's testimony is

21   contradicted by what the witness said or did

22   at another time or by the testimony of

23   another witness, you may believe or

24   disbelieve all or any part of the witness's

25   testimony.

1        You may consider the facts I have

2   discussed in weighing the weight or

3   determining the weight to give to the

4   testimony.  Remember that the weight of the

5   evidence does not depend or turn on the

6   number of witnesses testifying on one side or

7   the other.  The weight of the evidence is not

8   determined by the number of witnesses

9   testifying to the existence or nonexistence

10  of a fact.  You may find the testimony of a

11  single witness or a few witnesses to a

12  particular fact is more credible than the

13  testimony of a large number of witnesses to

14  the contrary.

15       In other words, what you must try to do

16  in deciding credibility is to size up a

17  person in light of his or her demeanor, the

18  explanations the witness gave in light of all

19  of the other evidence in the case, and weigh

20  all of that just as you would in any other

21  matter when you are trying to decide if a

22  person is being truthful, straightforward,

23  and accurate in his or her recollection.

24       In deciding the questions of

25  credibility, remember you should use your

1      common sense, your good judgment, and your

2      experience.

3            One final word about witnesses:

4            There may be individuals -- in fact,

5      there are -- whose names have been mentioned

6      but who were not called to testify, and one

7      or more of the attorneys may have referenced

8      the absence of that person from the trial.

9            I instruct you that each party has had

10     an equal opportunity or lack of opportunity

11     to call any of these individuals as

12     witnesses.  Therefore, you should not draw

13     any inferences or reach any conclusions as to

14     what they would have testified to had they

15     been called.  There absence should not affect

16     your judgment in any way.

17          You should, however, remember that the

18     law does not impose upon a defendant in a

19     criminal case any burden or duty to call any

20     witness or introduce any evidence at all.

21          Ladies and gentlemen, I will now turn to

22     the indictment.

23          Dr. Kosinski has been charged by an

24     indictment -- by an indictment, and an

25     indictment is only a means by which the

1        Government accuses a defendant of a

2        commission of a crime.  It merely describes

3        the charges against the defendant, and it is

4        not evidence of any kind against

5        Dr. Kosinski.

6           The defendant is presumed to be innocent

7        of the crimes charged in the indictment.

8        Even though the indictment has been returned

9        against Dr. Kosinski, I instruct you, as I

10       had done earlier, that he began this trial

11       with no evidence against him and that he has

12       pled not guilty to each count in which he's

13       named, and, therefore, he denies that he is

14       guilty of the charges against him.

15          Counts 1 and 2 of the indictment charge

16       the defendant with securities fraud,

17       specifically insider trading.

18          And I will now recite to you the

19       indictment.

20          The indictment alleges that at all times

21       relevant to the indictment, the defendant,

22       Edward Kosinski, was a resident of Weston,

23       Connecticut, and the president of the

24       Connecticut Clinical Research, LLC, CCR,

25       located in Bridgeport, Connecticut.

1          Regado Biosciences, Inc., also referred

2     to as Regado, was a Delaware corporation with

3     its principal and executive offices located

4     in Basking Ridge, New Jersey.  Regado was a

5     biopharmaceutical company whose common stock

6     traded on the Nasdaq, a national securities

7     exchange under the banner signal RGDO.

8          From on or about September 2013 until in

9     or about June 2014, Regado enrolled patients

10    in a Phase 3 REGULATE-PCI clinical trial,

11    referred to as the "trial," which studied the

12    efficacy of Regado's clinical drug candidate

13    known as REG1.

14         Regado entered into an agreement with

15    Cleveland Clinic Coordination Center for

16    clinical research whereby C5Research

17    coordinated and managed the trial.

18         On or about June 12, 2013, Kosinski on

19    behalf of CCR entered into a confidential

20    disclosure agreement with Regado in order to

21    receive confidential or proprietary

22    information to evaluate CCR's interest in

23    participating in the trial.  CCR agreed to

24    keep that information received confidentially

25    and not to disclose such information to any

person or entity without the prior written
consent of Regado.

On or about January 29, 2014, Kosinski
on behalf of CCR entered into a research -- a
research study agreement with C5Research, the
authorized agent of Regado.  Kosinski
individually as principal investigator also
acknowledged and agreed to the terms of the
research agreement.  The research agreement
required CCR and Kosinski to maintain in
strict confidence all of the confidential
information which included all information,
all materials provided by C5Research or
Regado during the course of the trial.

Beginning in or about October 2013 and
ending in about May of 2014, Kosinski
purchased shares of Regado common stock,
eventually acquiring a total of 40,000
shares.

Count 1 alleges securities fraud,
insider trading, and incorporates the portion
of the indictment I just recited to you.

Count 1 further alleges that on or about
June 29, 2014, REGULATE-PCI investigators and
study coordinators including Kosinski

received an email from the C5Research
REGULATE-PCI team which stated that there had
been severe allergic reactions during the
trial.  The acceptance of new subjects was
put on hold until July 2nd, 2014, and the
Data and Safety Monitoring Board, DSMB, would
be reviewing the recent events.  This
information was confidential and nonpublic
and material.

On about June 30th, 2014, while in
possession of the above-referenced material,
nonpublic information concerning the trial,
and in violation of a duty in trust and
confidence, Kosinski knowingly and willfully
and with intent to defraud sold 80,000 shares
of Regado stock between $6.59 and $7.00 per
share for a total of approximately $272,561.

On about July 2nd, 2014, the closing
price of RGDO was $6.76 after the close of
the stock market.  Regado publicly disclosed
that the DSMB had initiated an unplanned
review of the trial and that enrollment had
been paused until the DSMB had completed its
analysis.

On July 3rd, 2014, the closing price of

1    Regado on the Nasdaq was $2.81. Kosinski

2    thus avoided a loss of approximately

3    $160,000.

4         On or about June 30th, 2014, Kosinski

5    knowingly and willfully, directly and

6    indirectly, by the use of means of an

7    instrumentality of interstate commerce and

8    the facilities of a national securities

9    exchange, used and employed manipulative

10   devices and contrivances in connection with

11   the purchase and sale of securities in

12   contravention of the rules and regulations

13   prescribed by the Securities and Exchange

14   Commission, namely, Title 17 Federal

15   Regulations Section 240.10b-5, by employing a

16   device, scheme, or artifice to defraud, all

17   in violation of Title 15 United States Code

18   Section 78j(b) and 78ff and Title 17 Code of

19   Federal Regulations Section 240.10b-5.

20        Count 2 also charges securities fraud

21   insider trading and also specifically

22   incorporates paragraphs 1 through 6 as does

23   Count 1.

24        Count 2 further alleges that on or about

25   July 29, 2014, REGULATE-PC investigators and

1    study coordinators including Kosinski

2    received an email from the C5Research

3    REGULATE-PCI team, which informed

4    investigators of a death that occurred in the

5    trial and that the trial was on hold pending

6    the DSMB assessment.  This information was

7    confidential, nonpublic, and material.

8         On or about July 31, 2014, while in

9    possession of the above-referenced material,

10   nonpublic information concerning the trial,

11   and in violation of a duty of trust and

12   confidence, Kosinski knowingly and willfully

13   and with the intent to defraud purchased

14   50 RGDB [sic] put option contracts -- that's

15   Regado -- put options with a strike price of

16   $2.50 and an expiration date of October 18th,

17   2014, giving him the right to sell 5,000

18   shares of Regado stock.  On July 31, 2014,

19   the closing price of Regado stock was $2.91.

20        On or about August 25th, 2014, before

21   the opening of the stock market, Regado

22   publicly announced that it permanently halted

23   the trial.  Regado's share price fell

24   approximately 60 percent, closing at $1.13.

25        On or about August 28, 2014, Kosinski

1      purchased 5,000 shares of Regado for

2      approximately $1.13 a share and then

3      exercised his put options, selling 5,000

4      shares of Regado stock for $2.50 per share,

5      netting more than $3,000 after the cost of

6      the put option contracts.

7           On or about July 31, 2014, to about

8      August 24, 2014 -- 28 -- August 28, 2014,

9      Kosinski knowingly and willfully, directly

10     and indirectly, by use and means of

11     instrumentalities of interstate commerce or

12     the facilities of a national securities

13     exchange, used and employed manipulative

14     devices and contrivances in connection with

15     the purchase and sale of securities in

16     contravention of the rules and regulations

17     prescribed by the Securities and Exchange

18     Commission, namely, Title 17 Code of Federal

19     Regulations Section 240.10b-5, by employing a

20     deceptive scheme or artifice to defraud, all

21     in violation of Title 15 United States Code

22     Section 78j(b) and 78ff and Title 17 United

23     States Code of Federal Regulations

24     Section 240.10b-5.

25          The defendant has denied that he is

1　　　　　guilty of all of these charges.

2　　　　　　　　It does not matter whether the specific

3　　　　violation is alleged to have occurred on a

4　　　　certain date and the evidence shows that, in

5　　　　fact, it occurs on another date.  The law

6　　　　only requires a substantial similarity

7　　　　between the dates alleged in the indictment

8　　　　and the dates established by the testimony,

9　　　　and the same goes for most of the other

10　　　　facts -- factual contentions in the

11　　　　indictment.

12　　　　　　　Thus it is not necessary for the

13　　　　Government to prove the exact date, time, or

14　　　　location specified in the indictment.

15　　　　　　　As you know, the indictment consists of

16　　　　two counts.  Each count charges the defendant

17　　　　with a different crime.  You must, as a

18　　　　matter of law, consider each count of the

19　　　　indictment, and you must return a separate

20　　　　verdict on each count with which the

21　　　　defendant is charged.

22　　　　　　　Whether you find the defendant guilty or

23　　　　not guilty as to one offense or charge should

24　　　　not affect your verdict as to the other

25　　　　offense or charge.

1          You may not draw any inferences

2     favorable or unfavorable toward the

3     United States or the defendant from the fact

4     that certain persons were not indicted, are

5     not on trial, or are not named as defendants

6     in the indictment.  The circumstances that

7     other individuals were not indicted or are

8     not on trial must play no part in your

9     deliberations.  It should be of no concern to

10    you, and you should not speculate as to

11    reasons for their absence.  Their absence

12    should not influence your verdict with

13    respect to the defendant who is on trial.

14    You must base your verdict as to the

15    defendant based solely upon the evidence

16    against him.

17          Whether a person should be named as a

18    defendant is a matter within the sole

19    discretion of the United States Attorney and

20    the Grand Jury, and, therefore, you may not

21    consider it in any way in reaching your

22    verdict as to Dr. Kosinski.

23          Now, we're going to take a quick

24    ten-minute break, and then I will resume with

25    the instructions.  Please leave your

```
1              instructions and the verdict form on your
2              chair and retire to the jury room,
3              remembering and abiding by your oath not to
4              discuss the case amongst yourselves or with
5              anyone else, not to allow anyone to discuss
6              the case with you, and not to learn anything
7              about the case during this very brief
8              ten-minute recess.
9                   Thank you.
10
11                  (Jury panel exited the courtroom.)
12
13                  (Recess:  2:57 to 3:17 p.m.)
14
15                  THE COURT:  Please bring the jury back
16             in.
17                  MS. CHERRY:  Your Honor?
18                  THE COURT:  Yes.
19                  MS. CHERRY:  Before we bring the jury
20             back in, when you were reading the
21             indictment --
22                  THE COURT:  Yes.
23                  MS. CHERRY:  -- I think that you may
24             have misstated or misspoke two -- a couple
25             words in two paragraphs of the indictment,
```

1    and I can let you know what they are.  We

2    were hoping that maybe you could on the

3    record make the corrections.

4      The first one was in paragraph 8.  "The

5    indictment reads that the email stated that

6    there had been several allergic reactions,"

7    but your Honor --

8      THE COURT:  Severe.

9      MS. CHERRY:  -- said "severe," and only

10   because the defense has made such a big deal

11   about the typo that we had --

12     THE COURT:  Yes.

13     MS. CHERRY:  -- I just wanted to raise

14   that.

15     THE COURT:  Yes.

16     MS. CHERRY:  Thank you.

17     And then in paragraph 9, I think you

18   said, "with intent to defraud sold his 80,000

19   shares" -- is what I heard.  The indictment

20   says 40,000.  Maybe I misheard you.

21     THE COURT:  I think -- yeah, I don't

22   think I said 80,000, but I'll clarify 40,000

23   shares.

24     MS. CHERRY:  Okay.  But certainly for

25   the first one, like I said --

```
1              THE COURT:  Yes.

2              MS. CHERRY:  -- just because they have

3         raised it.

4              THE COURT:  Yes.

5              MS. CHERRY:  Thank you.

6              THE COURT:  Yes.  No.  You're right.

7              All righty.  Please bring them in.

8

9              (Jury panel entered the courtroom.)

10

11             THE COURT:  Excuse me.  Would counsel

12        please stipulate to the presence of the

13        entire jury?

14             MS. CHERRY:  Yes, your Honor.

15             MR. SPEARS:  Yes, your Honor.

16             THE COURT:  Please be seated, ladies and

17        gentlemen.

18             I made at least one, possibly two,

19        errors in reciting the indictment.  First is

20        that --

21             This is July 29; correct?

22             MS. CHERRY:  June 29th, your Honor.

23             THE COURT:  June 29.  June 29.

24             I misstated what the indictment says.

25        The indictment says there were "several
```

1      allergic reactions," not "severe allergic

2      reactions."  The word was "several."  And

3      you'll have the indictment with you in the

4      jury room.

5           But -- and Dr. Kosinski sold 40,000

6      chairs of stock.  Someone believes they

7      heard -- that I said, "80,000."  I'm not

8      certain, but to make absolutely sure that

9      what you have is accurate, he sold 40,000

10     shares.

11          So we will pick up where we left off.

12          All right.  I'm turning now to the

13     elements of the charges if you'd like to go

14     there.

15          Okay.  In order for you to find

16     Dr. Kosinski guilty of a particular charge,

17     you must find that the Government has proven

18     beyond a reasonable doubt all of the elements

19     of that charge against the defendant.  In

20     performing this duty, you must fairly and

21     impartially consider all of the evidence

22     introduced to prove the elements against

23     the -- of the charge against the defendant

24     including the lack of element -- evidence.

25     If you feel that the --

1          Give me a second here.

2          (Pause.)

3          THE COURT:  Okay.  In order for you to

4     find Dr. Kosinski guilty of a particular

5     charge, you must find the Government has

6     proven beyond a reasonable doubt all of the

7     elements of that charge against the

8     defendant.  In performing this duty, you must

9     fairly and impartially consider all of the

10    evidence introduced to prove the charge

11    against the defendant and the lack of

12    evidence.

13         If you view the evidence against the

14    defendant as reasonably permitting two

15    conclusions, one of innocence and one of

16    guilt, you have a reasonable doubt, and you

17    may not find the defendant guilty of that

18    charge.  Put another way, after considering

19    all of the evidence against Dr. Kosinski, if

20    you have a reasonable doubt that the

21    Government has proven every element of the

22    count against Dr. Kosinski, it is your duty

23    not to find him guilty.

24         On the other hand, if after your fair

25    and impartial consideration of all of the

1          evidence against Dr. Kosinski you are

2          satisfied that the Government has proven

3          beyond a reasonable doubt each element of the

4          charge against him, you must find him guilty.

5               As I've already instructed you, the

6          indictment charges the defendant with

7          securities fraud.

8               Count 1 of the indictment charges that:

9               "On or about June 30th, 2014, Kosinski

10         knowingly and willfully, directly and

11         indirectly, by use of means and

12         instrumentalities of interstate commerce and

13         the facilities of a national securities

14         exchange, used and employed manipulative

15         devices and contrivances in connection with

16         the purchase and sale of securities in

17         contravention of the rules and regulations

18         prescribed by the Securities and Exchange

19         Commission, namely, Title 17 Code of Federal

20         Regulations Section 240.10b-5, by employing a

21         device, scheme, or artifice to defraud, all

22         in violation of Title 15 United States Code

23         Section 78j(b) and 78ff and Title 17 Code of

24         Federal Regulations Section 240.10b-5."

25               Count 2 of the indictment alleges that:

1          "From or about July 31st, 2014, through

2          on or about August 28, 2014, Kosinski

3          knowingly and willfully, directly and

4          indirectly, by use of means and

5          instrumentalities of interstate commerce and

6          the facilities of a national securities

7          exchange, used and employed manipulative

8          devices and contrivances in connection with

9          the purchase and sale of the securities in

10         contravention of the rules and regulations

11         prescribed by the Securities and Exchange

12         Commission, namely, Title 17 Code of Federal

13         Regulations sections 240.10b-5, by employing

14         a device, scheme, or artifice to defraud, all

15         in violation of Title 15 United States Code

16         Section 78j(b) and 78ff and Title 17 Code of

17         Federal Regulations Section 240.10b-5."

18         The relevant statute on this subject is

19         Title 15 United States Code Section 78j(b),

20         which provides:

21         "It shall be unlawful for any person,

22         directly or indirectly, by use of any means

23         or instrumentality of interstate commerce or

24         of the mails or of any facility of any

25         national securities exchange to use or employ

1    in connection with the purchase or sale of a

2    security registered on any national security

3    exchange or any security not so registered or

4    any security-based swap agreement any

5    manipulative or deceptive device or

6    contrivance in contravention of such rules

7    and regulations as the Securities and

8    Exchange Commission may prescribe as

9    necessary or appropriate in the public

10    interest or for the protection of investors."

11    Rule 10b-5 is promulgated by the

12    Securities and Exchange Commission, and it

13    reads as follows:

14    "It shall be unlawful for any person,

15    directly or indirectly, by use of any means

16    or instrumentality of interstate commerce or

17    of the mails or any facility of any national

18    securities exchange, (a) to employ any

19    device, scheme, or artifice to defraud; (b)

20    to make any untrue statement of a material

21    fact or omit to state a material fact

22    necessary in order to make the statements

23    made, in light of the circumstances under

24    which they were made, not misleading; or, (c)

25    to engage in any act, practice, or course of

business that operates or would operate as a
fraud or deceit upon any person in connection
with the purchase or sale of securities."

I'm now going to instruct you on the
elements of the offense.

In order to meet its burden of proof,
the Government must establish beyond a
reasonable doubt the following elements of
the crime of securities fraud:

First, that, in connection with the
purchase or sale of the security, the
defendant employed a device, scheme, or
artifice to defraud or engaged in an act,
practice, or course of dealing that operated
or would operate as a fraud or deceit upon a
purchaser or seller of the specific security.

The second element is that the defendant
acted willfully, knowingly, and with the
intent to defraud.

The third element is that the defendant
used or caused to be used any means or
instrument of transportation or communication
in interstate commerce or the mails or any
facility of a national securities exchange in
furtherance of the fraudulent conduct.

1          I will now instruct you on each of these

2     elements in detail.

3          The first element that the Government

4     must prove beyond a reasonable doubt is that,

5     in connection with the purchase and sale of a

6     specific security, Dr. Kosinski deployed a

7     scheme or artifice or engaged in an act,

8     practice, or course of business that operated

9     or would operate as a fraud or deceit on a

10    purchaser or seller of the specific security.

11         A device, scheme, or artifice is merely

12    a plan for the accomplishment of any

13    fraudulent objective.  The device, scheme, or

14    artifice that the indictment alleges the

15    defendant employed in this case is known as

16    "insider trading."

17         Insider trading occurs when a person

18    misappropriates material nonpublic

19    information and then trades in securities in

20    breach of the duty of trust and confidence

21    which he or she owes to the source of that

22    information.  When a person has material

23    nonpublic information and his duty of trust

24    and confidence to the source of the

25    information prevents him from disclosing that

1      information, the law forbids him from buying

2      or selling the securities in question.

3          In order to find that the Government has

4      established the first element that

5      Dr. Kosinski engaged in an inside trading

6      scheme, the Government must prove the

7      following beyond a reasonable doubt:

8          First, that Dr. Kosinski had a duty of

9      trust and confidence to Regado Bioscience,

10     Inc., which I will refer to herein as

11     "Regado."

12         And, second, that Dr. Kosinski violated

13     his duty of trust and confidence in

14     connection with trading in Regado stock or

15     options by using material nonpublic

16     information that he obtained by virtue of his

17     agreement with Regado through its authorized

18     agent Cleveland Clinic Foundation.

19         I will now define for you several of the

20     relevant terms I just used.

21         The Government must establish beyond a

22     reasonable doubt that Dr. Kosinski had a duty

23     of trust and confidence to Regado.  That

24     means that he was reasonably expected to keep

25     the material information at issue

confidential or at least that the
relationship between the defendant and Regado
reasonably implied such a duty.  Whether such
a duty of trust and confidence existed
between the defendant and Regado is a
question of fact for you to determine.

The duties and obligations between the
defendant and Regado may have been expressed
explicitly in writing or may be inferred from
the nature and circumstances of their
relationship including through any agreement
with Regado through its authorized agent
Cleveland Clinic Foundation.

Dr. Kosinski and Regado must each
recognize the existence of a duty of trust
and confidence, although the understanding or
mutual recognition may be either express or
implied.  A mere working relationship is not
sufficient to satisfy this element; however,
a person has a requisite duty of trust and
confidence whenever a person agrees to
maintain information in confidence.

If you find that Dr. Kosinski had a duty
of trust and confidence to Regado, then you
must next consider whether the Government has

1      proved beyond a reasonable doubt that

2      Dr. Kosinski breached the duty of trust and

3      confidence by using material nonpublic

4      information he received directly or

5      indirectly from Regado in connection with

6      trading in Regado stock or options.

7           I will now define for you the terms

8      "material" and "nonpublic."

9           Information is material if there is a

10     substantial likelihood that a reasonable

11     investor would have considered it important

12     in deciding whether to buy, sell, or hold a

13     security and at what price to buy, sell, or

14     hold the security.  In other words, there

15     must be a substantial likelihood that a

16     reasonable investor would have viewed the

17     information at issue as significantly

18     altering the total mix of information

19     available.  Materiality of information is

20     judged as of the time the information is used

21     to trade.

22          Information is nonpublic at the time it

23     was used to trade if it was not available to

24     the public through sources such as press

25     releases, Securities and Exchange Commission

1          filings, scientific journals, trade

2          publications, analysts' reports, newspapers,

3          magazines, television, radio, rumors, word of

4          mouth, websites, internet chat rooms, or

5          online message boards.

6               In assessing whether information is

7          nonpublic the key word is "available."  If

8          the information is available in the public

9          media, analysts' report, scientific journals,

10         SEC filings, then it is public.

11              If you find that the Government has

12         proved beyond a reasonable doubt that

13         Dr. Kosinski used material nonpublic

14         information in breach of a duty of trust and

15         confidence to Regado, you must then determine

16         whether he used that information in

17         connection with trading in Regado stock or

18         options.

19              A person uses information in connection

20         with trading a stock or options when that

21         information is a factor, however small, in

22         his decision to buy or sell the stock or

23         option.  You may find that Dr. Kosinski's

24         conduct was in connection with the purchase

25         or sale of a stock or option even if there

1       was no evidence that other purchasers or

2       sellers were harmed.

3           Turning now to the second element:

4       knowledge, intent, and willfulness.

5           The second element that the Government

6       must prove beyond a reasonable doubt is that

7       the defendant participated in the scheme to

8       defraud knowingly, willingly, and with the

9       intent to defraud.

10          To act knowingly means to act

11      voluntarily and deliberately rather than

12      mistakenly or inadvertently.

13          To act willfully means to act knowingly

14      and purposefully with the intent to do

15      something that the law forbids, that is, with

16      bad purpose either to disobey or to disregard

17      the law.

18          Intent to defraud in the context of the

19      securities laws means to act knowingly and

20      with the intent to deceive.  For Dr. Kosinski

21      to have acted with the specific intent to

22      deceive means that he must have known of the

23      fraudulent nature of the scheme and acted

24      with intent that it succeed.

25          It is not required that the Government

1    show that Dr. Kosinski, in addition to

2    knowing what he was doing and deliberately

3    doing it, also knew that he was violating

4    some particular statute. But the defendant

5    must have acted with knowledge and intent to

6    carry out the insider trading scheme.

7        The question of whether a person acted

8    knowingly, willfully, and with an intent to

9    defraud is a question of fact for you to

10   determine like any other fact question. This

11   question involves one's state of mind.

12       Suffice it to say that direct proof of

13   knowledge and fraudulent intent is almost

14   never available. It would be a rare occasion

15   when it can be shown that a person wrote or

16   stated that as of a given time in the past he

17   committed an act with fraudulent intent.

18   Such direct proof is not required. Please

19   recall my instruction or circumstantial

20   evidence.

21       The ultimate fact of knowledge and

22   criminal intent, though subjective, may be

23   established by circumstantial evidence based

24   upon a person's outward manifestations, his

25   words, his conduct, his acts, and all of the

surrounding circumstances disclosed by the
evidence and the rational and logical
inferences that may be drawn there therefrom.

As I have instructed you, circumstantial
evidence is of no less value than direct
evidence.  It is for you to determine based
upon all of the evidence whether the
Government has established beyond a
reasonable doubt such knowledge and intent on
the part of the defendant.

Because the essential elements of the
crime charged is intent to defraud, it
follows that good faith on the part of the
defendant is a complete defense to a charge
of securities fraud.  It is for you to decide
whether the defendant acted in good faith.  A
defendant, however, has no burden to
establish a defense of good faith.  The
burden is always on the Government to prove
fraudulent intent and a consequent lack of
good faith beyond a reasonable doubt.

To conclude on this element, if you find
that Dr. Kosinski was not a knowing
participant in the scheme or lacked the
intent to deceive, you should acquit him.  On

1          the other hand, if you find that the

2          Government has established beyond a

3          reasonable doubt not only the first element,

4          namely, the existence of a scheme to defraud,

5          but also the second element that Dr. Kosinski

6          was a knowing participant and acted with the

7          intent to defraud and if the Government has

8          also proved beyond a reasonable doubt the

9          third element as to which I'm about to

10         instruct you, then you have sufficient basis

11         upon which to convict him.

12              Turning now to the third element:

13         instrumentality of interstate commerce.

14              The third and final element that the

15         Government must prove beyond a reasonable

16         doubt is that Dr. Kosinski knowingly used or

17         caused to be used an instrumentality of

18         interstate commerce or used or caused to be

19         used a facility of a national security

20         exchange in furtherance of the scheme to

21         defraud or fraudulent conduct.

22              The term "instrumentality of interstate

23         commerce" means instruments, devices, and

24         means of conducting trade, commerce,

25         transportation, or communication among any

1     two states.  Instrumentality of interstate

2     commerce includes the use purely within one

3     state of a telephone or any other instrument

4     used in the conduct of interstate commerce.

5          I instruct you that the Nasdaq is a

6     national securities exchange.  The term

7     "facility of a national securities exchange"

8     includes any property or services maintained

9     by Nasdaq.

10         It is not necessary that the defendant

11     be directly or personally involved in the use

12     of an instrumentality of interstate commerce

13     or use of any facility of a national security

14     exchange.  It is enough for you to find that

15     the defendant was an active participant in a

16     scheme and took steps or engaged in conduct

17     that he knew or could reasonably foresee

18     would naturally and probably result in the

19     use of an instrumentality of interstate

20     commerce or use of a facility of a national

21     securities exchange.  This includes placing a

22     telephone call or an order to a brokerage

23     firm to buy or sell securities.

24         It is not necessary that the

25     communication over the instrumentality of

1       interstate commerce concern any fraudulent

2       material or anything criminal or

3       objectionable.  The matter communicated may

4       be entirely innocent so long as it is in

5       furtherance of a scheme to defraud or

6       fraudulent conduct.

7           The use of an instrumentality of

8       interstate commerce need not be central to

9       the execution of the scheme and may even be

10      incidental to it.  All that is required is

11      that the use of an instrument of interstate

12      commerce bore some relationship to be object

13      of the scheme or fraudulent conduct.

14          Each specific use of an instrumentality

15      of interstate commerce in furtherance of a

16      scheme to defraud constitutes a separate and

17      distinct criminal offense.

18          Ladies and gentlemen, we're coming close

19      to the end.  I will now give you the final

20      instructions.  First is the possible

21      punishment.

22          As you recall from jury selection, the

23      question of possible punishment of

24      Dr. Kosinski is of no concern to the jury and

25      should not in any sense enter into or

1    influence your deliberations.  The duty to

2    impose a sentence rests exclusively with the

3    Court.

4         Your function is to weigh the evidence

5    in the case and to determine whether or not

6    Dr. Kosinski is guilty beyond a reasonable

7    doubt solely on the basis of the evidence.

8         Under your oath as jurors, you cannot

9    allow a consideration of punishment that may

10   be imposed upon Dr. Kosinski if he is

11   convicted to influence your verdict in any

12   way or enter into your deliberations in any

13   sense.

14        Now, you've been permitted to take notes

15   during the course of the trial.  Any notes

16   you have taken should be used only as memory

17   aids and only to refresh your own personal

18   recollection.  Do not give or otherwise share

19   your notes with your fellow jurors.  Your

20   notes are not more important than your

21   independent recollection of the evidence.  If

22   you did not take notes, you should rely upon

23   your memory of the proceedings and should not

24   be unduly influenced by the notes of another

25   juror.  The notes are not evidence and should

1    not be shared.  Any difference of opinion

2    between a juror's recollection and another

3    juror's notes should be settled by reviewing

4    the evidence.  You may do that by asking me

5    to have the court reporter play the official

6    transcript, for it is the court's record

7    rather than any juror's notes upon which the

8    jury must base its determination of the facts

9    and the verdict.

10    I am sending a copy of the indictment

11    into the jury room for you to have with you

12    during your deliberations.  You may use it to

13    read the crimes that the defendant is charged

14    with committing.  You are reminded, however,

15    that the indictment is merely an accusation

16    and it is not to be used by you as any proof

17    of the conduct charged.

18    Let me remind you that the Government in

19    order to prevail must prove all of the

20    essential elements of the count you are

21    considering beyond a reasonable doubt.  If

22    the Government succeeds, your verdict should

23    be guilty to the charge in question.  If the

24    Government fails their burden of proving

25    beyond a reasonable doubt the charge you are

considering, your verdict must be not guilty

to that charge.  In order to return a verdict

on a charge, it is necessary that each juror

agree with it.  Your verdict, in other words,

must be unanimous and represent the

considered judgment of each and every juror.

Your function is to weigh the evidence

in the case and to determine whether or not

the evidence establishes Dr. Kosinski is

guilty beyond a reasonable doubt.  Each of

you must make your own decision, but you must

consider all of the evidence and the views of

your fellow jurors.  It is your duty to

confer with one another with a view toward

reaching an agreement if you can do so

consistent with your individual judgment.

That is the very purpose of jury

deliberations -- to discuss and to consider

the evidence, to listen to the views of the

other jurors, to present your views, to

consult with one another, and to reach an

agreement based solely and wholly on the

evidence if you can do so without violence to

your own individual judgment.  Until a

verdict is agreed to by each and every juror,

1           it is not a unanimous verdict.

2                   In the course of your discussions, do

3           not hesitate to reexamine your own individual

4           views or to change your opinions if the

5           deliberations and the views of your fellow

6           jurors convince you to do so.  However, you

7           should not surrender your own convictions

8           about the facts or about the weight or effect

9           of the evidence solely because of the opinion

10          of your fellow jurors or merely to bring an

11          end to your deliberations.

12                  If, after careful consideration of all

13          of the evidence and the arguments of your

14          fellow jurors, you have a genuine and

15          conscientious dispute that differs from the

16          others, you must be true to your conscience

17          and not change your view simply because

18          you're outnumbered or simply to bring an end

19          to the deliberations.  So if your view is

20          different from your fellow jurors, you must

21          be true to your position if you cannot in

22          good conscience accept the position of your

23          fellow jurors.

24                  Your verdict must reflect your

25          conscientious conviction of how the issues

1    should be decided.  Remember at all times

2    that you're not partisans.  Rather, you are

3    the judges of the fact and your sole interest

4    is in seeking the truth from the evidence

5    presented in this case.

6         I will now instruct you on some

7    practical considerations.

8         When you return to the jury room, you

9    must first elect a foreperson to act as your

10   representative.  The foreperson doesn't have

11   any more power or authority than any other

12   juror, and his or her opinion does not count

13   for any more than any other juror's vote or

14   opinion.  The foreperson merely presides over

15   your deliberations and is your spokesperson

16   to the Court.  He or she will send out any

17   notes, and when the jury has reached a

18   verdict, he or she will notify the marshal or

19   Mr. Shafer that the jury has reached a

20   verdict and will announce your verdict in the

21   courtroom by reading the verdict aloud.

22        After you have retired to begin your

23   deliberations, you are not to leave your jury

24   room without first notifying the marshal who

25   will be stationed outside the room and, if

1    appropriate, will escort you.

2         No deliberations may take place without

3    all jurors being present and attentive.  If

4    you bring your cell phones into the jury

5    room, you must turn them off during

6    deliberations.  Further, if at any time a

7    juror is in the restroom or on a cell phone

8    or otherwise engaged, the other jurors must

9    cease deliberations and may not recommence

10   deliberations until all of the jurors are

11   present and attentive.

12        As previously instructed, it is your

13   duty to discuss the case with your fellow

14   jurors for the purpose of reaching an

15   agreement if you can do so in good

16   conscience.  Each of you must decide the case

17   for yourself but do so only after considering

18   all of the evidence, the views of your fellow

19   jurors, and your discussion of the case with

20   your fellow jurors.

21        Remember that your verdict must be

22   unanimous as to each charge.  That does not

23   mean that, if the jury takes a vote and it is

24   not unanimous, the jury has reached a final

25   decision one way or the other.  If at any

1    time the jury does an inconclusive vote --

2    that is, a vote that is not unanimous -- the

3    jury vote is just that -- inconclusive.

4    Remember also that your verdict must be

5    based solely on the evidence in the case and

6    the law as I have given it to you and not on

7    anything else.  The parties' summations of

8    the evidence and their other statements or

9    arguments are not evidence.  If your

10   recollection of the evidence differs from a

11   party's recollection, it is your recollection

12   that counts.

13    A verdict form has been prepared for

14   your convenience to assist you in your

15   deliberations.  The foreperson must complete

16   the verdict form and deliver it in open court

17   after you have reached your unanimous

18   verdict.  You must answer the questions in

19   the order in which they appear on the form

20   and each answer must be unanimous.  When you

21   have reached a unanimous agreement as to your

22   verdict, you'll have your foreperson fill in

23   your answers and date, sign the verdict form,

24   and print the name of the foreperson under

25   the signature line.

1          If the foreperson makes an error in

2     completing the verdict form, please do not

3     strike out the error and add a correct

4     response.  Instead, request a new verdict

5     form so that the official form entered on the

6     court record is correct and error free.  When

7     you've completed the verdict form, inform the

8     court security officer or Mr. Shafer that

9     you've reached a verdict.  The verdict form

10    must be used only in connection with the

11    charge I just gave you.  And the terms used

12    in the verdict form are as discussed in my

13    instructions, and these instructions must

14    govern your deliberation and verdict.

15         I want to caution you now to take your

16    time when completing the verdict form and

17    deliberating.  As you can see that the form

18    consists of a series of questions, each

19    question calling for a check mark or an "X."

20    Answer each and -- question as it appears and

21    only those questions.  Please read all of the

22    instructions and follow them carefully.

23         Do not begin your deliberations until

24    you have all of the exhibits with you.  You

25    will not have a transcript of the testimony.

1           If you need anything, have the foreperson

2      write a note clearly stating what you need.

3      If you need to have the testimony played

4      back, please state as specifically as

5      possible what you want to hear.

6           So, for example, if you want to hear the

7      testimony of a particular person, identify

8      the person and identify the subject matter of

9      that person's testimony.  It will aid

10     Ms. Velez in identifying the specific portion

11     of the testimony to have ready for you to

12     rehear.

13          During your deliberations, you may only

14     speak with the Court, and all communication

15     with the Court must be made in a written note

16     signed by your foreperson.  A court security

17     officer or Mr. Shafer will be stationed

18     outside your door at all times while you're

19     deliberating.  I will respond to your request

20     as promptly as possible by either sending you

21     a note or having you come back into the

22     courtroom, depending.  Please be patient as

23     it may take some time for me to consider and

24     respond to your request, especially if you

25     request a playback.  However, please do not

1    hesitate to ask a question or for a playback.

2         Now, I must caution you that, in your

3    communications with the Court, you should

4    never reveal your numerical division of your

5    vote at any time.

6         It is proper to add a final caution.

7    Nothing that I have said in these

8    instructions and nothing that I have said or

9    done at any time during the trial has been

10   said or done to suggest to you what I think

11   your verdict should be.  What the verdict

12   shall be is your exclusive duty and

13   responsibility.

14        As you know, this case is important to

15   the parties; so please take as long as you

16   think necessary to fairly and impartially

17   reach your verdict.  Do not hurry your

18   deliberations.  Render your verdict with true

19   fidelity to your oath:  fairly, uprightly,

20   and without a scintilla of sympathy or

21   prejudice.

22        Members of the jury, this concludes my

23   instructions to you.

24        Now I would ask that Mr. -- yes.

25        ████████, would you please go into the

1     jury room and retrieve your personal

2     belongings and then come back into the

3     courtroom and sit here in the jury box.

4     Thank you.

5         I'm sorry.  I meant ██████████.

6     ██████████, would you please get your

7     belongings and come back here and ask

8     ██████████ to come back.

9         (Pause.)

10         THE COURT:  All right.  ██████████,

11    would you please come and sit in the jury

12    box.

13        All right.  At this time I would ask

14    the --

15        In the jury box, ██████████.  Sit right

16    over here.

17        At this time I would ask the remaining

18    jurors to please retire to the jury

19    deliberation room to begin your

20    deliberations.  Do not speak about the case

21    until after you choose your foreperson.  When

22    you have done that, have the foreperson send

23    out a note indicating who you have chosen.

24    Please print the note and have the foreperson

25    sign and date the note.  And knock on the

```
1        door.  The note will be retrieved.  And then

2        after you've done that and Mr. Shafer comes

3        in and makes the exhibits available to you,

4        you can begin your deliberations.

5             Thank you.

6             ███████, please -- please stay here.

7             A JUROR:  (Indiscernible - away from

8        microphone.)

9             THE COURT:  Leave those on your chairs,

10       please.

11            A JUROR:  (Indiscernible - away from

12       microphone.)

13            THE COURT:  Yes, you should stay.

14            Go back in the jury room with the

15       others, please, and just leave the paperwork

16       on your chairs.

17            A JUROR:  (Indiscernible - away from

18       microphone.)

19

20            (Jury panel exited the courtroom.)

21

22            THE COURT:  Please be seated.

23            ████████, as you may or may not

24       know -- you kind of looked like you didn't

25       know -- we selected 14 individuals to serve
```

1    on the jury, 12 regular jurors and 2

2    alternate jurors, and you were the second of

3    2 alternate jurors.  And as you know, we lost

4    ████████ well over a week ago, and that

5    loss signifies the importance of selecting

6    alternate jurors.

7        Although we can only have 12 jurors

8    deliberate in a criminal case and I cannot

9    allow you to proceed with deliberations at

10    this time, it is still conceivable that we

11    could lose a juror.

12        And so I am going to excuse you

13    provisionally with the instruction that you

14    continue to abide by your obligation and oath

15    not to discuss the case with anyone, not to

16    allow anyone to discuss the case with you,

17    and not to learn anything about the case.

18    Should we lose one of those jurors that just

19    walked into that room, we will have to call

20    you back, and the jury will have to begin its

21    deliberations anew.

22        So please you may leave with our thanks.

23    We certainly hope that we won't lose another

24    juror and we will not have to reenlist you

25    and have the jury begin the deliberations

```
1        anew.  But as a precaution, I'm not going to
2        excuse you and add that you continue to abide
3        by your oath.
4            But I want to thank you very much in
5        case we don't call you and let you how
6        important, how vital your service has been
7        and how much we truly appreciate you for
8        having done so.
9            A JUROR:  Thank you.
10           THE COURT:  Thank you.  You may leave if
11       you would like, and you may stay if you would
12       like, or you could come back tomorrow and see
13       what happens.
14           A JUROR:  Okay.
15           THE COURT:  Okay?  Thank you.
16
17           (Alternate juror exits the courtroom.)
18
19           (Pause.)
20           THE COURT:  I think they knocked on the
21       door.  I think there was a knock.
22           MR. FRANCIS:  Your Honor?
23           THE COURT:  Yes.
24           MR. FRANCIS:  I noted that some of the
25       jurors, I think, may have taken at least the
```

1    verdict forms with them.

2         THE COURT:  Would you please retrieve

3    everything, Jeremy.

4         Please be seated.

5         (Pause.)

6         THE COURT:  All right.  Mr. Spears, I

7    take it you would like to note for the record

8    that you are reasserting all of the

9    objections to the charge that you made in the

10   charging conference?

11        MR. SPEARS:  Yes, your Honor, that's

12   correct.  We do incorporate the objections

13   noted during the charge conference on

14   November 20th, 2017.

15        Just very briefly, if your Honor please,

16   we are objecting to the Court's Charge

17   Number 35, which is the first element of the

18   offense charging on insider trading.

19        THE COURT:  Are you reiterating what you

20   previously said?

21        MR. SPEARS:  I was only going to

22   summarize that, your Honor.  Just --

23        THE COURT:  It's on the record.  You've

24   done that already.

25        MR. SPEARS:  I just wanted to note for

1          the record since the charge numbers have

2          changed since our charge conference what our

3          objections were.

4                THE COURT:  Let's wait until he gets

5          out.

6                MR. SPEARS:  Okay.  Thank you, your

7          Honor.

8                THE COURT:  Okay.

9                (Pause.)

10                THE COURT:  Do you have a list of the

11          paragraph numbers?

12                MR. SPEARS:  I do, your Honor, yes.

13                THE COURT:  And the subject?

14                MR. SPEARS:  Yes.

15                THE COURT:  Were you able to retrieve

16          all of the verdict forms and jury

17          instructions?

18                COURTROOM DEPUTY:  (Indiscernible - away

19          from microphone.)

20                THE COURT:  Great.  Have they selected a

21          foreperson?

22                COURTROOM DEPUTY:  Yes, your Honor.

23                THE COURT:  They have?  Okay.  Would you

24          just state for the record who they've chosen.

25                COURTROOM DEPUTY:  The foreperson is

1           ███████████, Juror Number 4.

2               THE COURT:  Juror Number 4.  All righty.

3       That's good.

4               All righty.  Mr. Spears, you may

5       proceed.

6               MR. SPEARS:  Thank you, your Honor.

7               THE COURT:  Yes.

8               MR. SPEARS:  I appreciate the

9       opportunity.

10              Yes, so we are objecting to certain

11      aspects of the Court's instructions.  We're

12      incorporating the objections noted during the

13      charge conference on November 20th.

14              For the record, I just wanted to note

15      that we object to charge 35 as given.

16              And we submit that the language that we

17      submitted in the request to charge 39 is the

18      appropriate statement of the law and

19      respectfully should have been given to the

20      jury.

21              We object to Charge Number 36, which is

22      the second element:  knowledge, intent, and

23      willfulness.

24              We had requested in our request to

25      Charge Number 40 the law that we submit and

1           maintain is an accurate statement of the law

2           and respectfully should have been given to

3           the jury.

4                  And, finally, your Honor, we do object

5           to the verdict form.  Your Honor may recall

6           we had proposed a verdict form with

7           interrogatories as well, and we again think

8           that that was an appropriate verdict form to

9           have been submitted.  So we take exception to

10          the verdict form provided to the jury.

11                 THE COURT:  Thank you.

12                 MR. SPEARS:  Thank you.

13                 THE COURT:  Your exceptions are noted

14          for the record.

15                 MR. SPEARS:  Thank you, your Honor.

16                 THE COURT:  All right.  It's close to

17          4:30, and I'm assuming that the jury will end

18          its day probably in the next half hour or so,

19          but it's not necessary that you be present.

20          I do like counsel to be present in the

21          morning when the jury arrives just so that we

22          can make a record of the entire jury being

23          present.  If you would prefer to stay to have

24          the jury retire in your presence while you

25          can confirm once again that the entire jury

1          is present, you're welcome to do that.

2               What's your pleasure?  Am I speaking

3          loudly enough?

4               MR. SPEARS:  Yes, your Honor.

5               MS. CHERRY:  Yes, your Honor.

6               THE COURT:  What's your pleasure?

7               MR. SPEARS:  Your Honor, from the

8          defense, we are happy to stay here for the

9          balance of the day today, and to your point

10         we can certainly make ourselves available at

11         the beginning of each day.  Is your Honor

12         having the jury come in at 9:30?

13              THE COURT:  Well, they're normally here

14         earlier.  They're normally here --

15              What time are they coming in, Jeremy?

16         8:30?

17              COURTROOM DEPUTY:  9:00 o'clock.

18              THE COURT:  9:00 o'clock.

19              MR. SPEARS:  9:00 o'clock.

20              THE COURT:  Yes.

21              MR. SPEARS:  So we'll be available at

22         9:00 a.m. tomorrow.

23              THE COURT:  Is that fine?

24              MR. SPEARS:  Yes.

25              THE COURT:  Okay.

```
1              MR. FRANCIS:  Your Honor?

2              THE COURT:  And the Government?

3              MR. FRANCIS:  I'm sorry.

4              THE COURT:  Yes.

5              MR. FRANCIS:  I'm just -- maybe I

6         misunderstood.  I understood your question to

7         be whether you want -- you were asking the

8         parties whether we preferred to have the jury

9         make an appearance in court at the end of the

10        day for you to discharge them, and the

11        Government -- we're happy to go along with

12        whatever the defendant thinks about that.  We

13        just want to know their position.

14             MR. SPEARS:  Yes.  We would like to be

15        present when the jury is discharged at the

16        end of the day.

17             THE COURT:  All righty.  We will do that

18        then.

19             MR. SPEARS:  Thank you, your Honor.

20             THE COURT:  You're welcome.

21             Now, at the end of the day, I generally

22        leave it to them as to what time they would

23        like to leave.  So when they finish today and

24        they come out, I will indicate that they're

25        to arrive at 9:00 o'clock as they normally do
```

```
1        but they should feel free to stay later than

2        4:30 if they feel they're close to a verdict

3        and remaining could be an efficient use of

4        their time.

5             MR. SPEARS:  Thank you, your Honor.

6        That's acceptable.

7             THE COURT:  Is that acceptable?

8             I don't want to say anything that might

9        be perceived by them as rushing them, which

10       is why I don't do it at the end of the day,

11       but I do like to tell them on the beginning

12       of the first full day that the schedule is

13       theirs to maintain.

14            MR. SPEARS:  Yes, your Honor.

15            THE COURT:  All righty.  Yes?

16            MS. CHERRY:  Your Honor, would they be

17       deliberating on Wednesday?

18            THE COURT:  No.

19            MS. CHERRY:  Okay.

20            THE COURT:  They will not deliberating

21       on Wednesday or Thursday.

22            MS. CHERRY:  Are those the dates in the

23       original schedule?  Should we notify them

24       tomorrow morning that they won't be

25       deliberating Wednesday or Thursday?
```

          THE COURT:  Yes.  Were those the dates

1   on the -- sent to the jurors because we get

2   different dates?  Were those the dates sent

3   to the jurors?

4          So I am speaking at a conference that

5   goes Wednesday and Thursday, and I think I'm

6   speaking on Wednesday afternoon.  So I could

7   certainly alter my schedule if I needed to,

8   but let's see what happens tomorrow.

9          MS. CHERRY:  Okay, your Honor.  Thank

10  you.

11         THE COURT:  But I will make inquiries

12  tomorrow morning so that I have an

13  understanding of what flexibility I have.

14         MS. CHERRY:  Okay.  Thank you, your

15  Honor.

16         THE COURT:  You're welcome.

17         All righty.  Anything else before we

18  retire -- or recess, rather?

19         MR. SPEARS:  Nothing further, your

20  Honor, from the defense.  Thank you.

21         THE COURT:  Great.  So stay -- make sure

22  Mr. Shafer has your cell phone numbers and/or

23  stay here but --

24         MS. CHERRY:  Thank you, your Honor.

1              THE COURT:  -- if you're going to leave,

2       make sure he has your cell phone number.

3

4              (Recess:  4:17 to 5:07 p.m.)

5

6              THE COURT:  Please be seated.

7              The jury had asked for a little bit more

8       time to deliberate, which we granted, and

9       they've now indicated that they're ready to

10       retire and return tomorrow morning.  So I

11       have kind of a feel that this is going to

12       resolve tomorrow.  We'll see.

13              Would you please bring them in.

14              (Pause.)

15

16              (Jury panel entered the courtroom.)

17

18              THE COURT:  Would counsel please

19       stipulate to the presence of the entire jury?

20              MS. CHERRY:  Yes, your Honor.

21              MR. SPEARS:  Yes, your Honor.

22              THE COURT:  Thank you.

23              Please be seated.

24              All right.  Ladies and gentlemen, I

25       wanted to explain to you that ██████████ is

1    no longer with you.  We selected 14 jurors

2    including 2 alternates, and only the 12

3    regular jurors can deliberate.

4            ████████████ was beginning a new

5    position and was required to appear for

6    training today and tomorrow, and had she not

7    done so, she would have lost that job and had

8    already given notice at her prior job.  So I

9    excused her, which meant we drafted the first

10   alternate.

11           ████████████ has not been excused, but he

12   is not deliberating with you -- oh, ████████.

13   I'm sorry.

14           You're ████████████.  Sorry.

15           ████████████.  That's right.  ████████████.

16           So, yes, ████████████ is still with you.

17   So ████████████ is no longer with us.  I just

18   wanted to explain that to you so that you

19   understood.

20           Now, we're going to begin tomorrow

21   morning as you normally do at 9:00 o'clock;

22   so the attorneys will be here so that we can

23   confirm that the entire jury is here.  You're

24   going to have your continental breakfast as

25   usual, and your lunch will be brought in as

1    well.  You can deliberate to your heart's

2    content.  We will check in with you around

3    4:00 o'clock, 4:30 -- 4:00 o'clock, 4:15 and

4    see where you are, how much longer you think

5    you may want to stay, but you shouldn't feel

6    any pressure if we do so.  We're just trying

7    to get a feel for whether we should stay a

8    little later or not.  Okay?

9         So please leave the case here.

10   Obviously I instructed you that you can only

11   discuss the case amongst yourselves and only

12   when all of you are present.  So when you go

13   home tonight, you'll be by yourself without

14   your fellow jurors, and you're certainly not

15   all going together; so you can't discuss the

16   case, can't allow anyone to discuss the case

17   with you.  You can't learn anything about the

18   case through any means whatsoever.  And just

19   leave the case right here in the jury room

20   when you leave and come back in the morning

21   fresh and ready to resume.

22        Thank you very much.  Have a great

23   evening.  We'll see you tomorrow morning.

24        A JUROR:  (Indiscernible - away from

25   microphone.)

```
1              THE COURT:  Good night.

2

3              (Jury panel exited the courtroom.)

4

5              THE COURT:  Ladies and gentlemen, have a

6         wonderful evening.  I'll see you in the

7         morning.

8              MR. SPEARS:  You too.

9              MS. CHERRY:  Thank you.

10             MR. SPEARS:  Thank you, your Honor.

11             MR. FRANCIS:  You too.

12

13             (Proceedings adjourned:  5:12 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          CERTIFICATE

2

3          I hereby certify that the foregoing 201 pages

4    are a complete and accurate transcription to the best

5    of my ability of the electronic recording of the

6    TRIAL - DAY 5 in re:  UNITED STATES OF AMERICA vs.

7    EDWARD J. KOSINSKI, Case No. 3:16-CR-00148 (VLB), held

8    before The Hon. Vanessa L. Bryant, United States

9    District Judge, in Hartford, Connecticut, on

10   November 17, 2017.

11

12       *Rachel M. Riemer*

13   _____     12-20-17

14   Rachel M. Riemer, Transcriber          Date
     Licensed Shorthand Reporter No. 518

15

16

17

18

19

20

21

22

23

24

25